HAMBURG-AMERICAN STEAM PACKET CO. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. January 10, 1918.)

No. 27.

1. NEUTRALITY LAWS ⬗3—PURCHASE OF SUPPLIES.
   The law of nations places no restrictions whatever upon the purchase of provisions or of coal by a belligerent in neutral ports; therefore there was nothing inherently wrong, prior to the declaration of war between the United States and Germany, in the act of citizens of Germany in purchasing in the United States coal and provisions to deliver to German vessels of war.

2. CRIMINAL LAW ⬗10—UNITED STATES—COMMON-LAW OFFENSES.
   There are no common-law offenses against the United States.

3. CONSPIRACY ⬗33—OFFENSES—"CONSPIRACY TO DEFRAUD THE UNITED STATES."
   As the laws of the United States require vessels proceeding from any of the several ports to obtain clearances showing the destination thereof, defendants, who conspired by means of false manifests to obtain for vessels clearing from ports of the United States and intended to supply coal and provisions to German warships on the high seas clearances falsely stating the destination of such vessels, come within Criminal Code (Act March 4, 1909, c. 321) § 37, 35 Stat. 1096 (Comp. St. 1916, § 10201), denouncing the offense of "conspiracy to defraud the United States," for the obtaining of such false clearances would injuriously affect the credit attached to other clearances issued by officers of the United States.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Conspiracy.]

⬗For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. CONSPIRACY ⬳33—OFFENSES—ELEMENTS.
   While, under Criminal Code, § 37, a conspiracy to defraud the United
   States is not punishable without an overt act, still it is not necessary to
   a conviction that all the conspirators should join in the overt act.

5. CONSPIRACY ⬳33—OFFENSES—NATURE OF.
   A conspiracy to defraud the United States, falling within Criminal
   Code, § 37, must be deemed corrupt, unlawful, and felonious, as alleged
   in the indictment, where the intention to defraud exists, though the sec-
   tion defining the offense does not use such terms.

6. CRIMINAL LAW ⬳313—DEFENSES—IGNORANCE OF LAW.
   It is elementary that every one is presumed to know the law of the
   land, both common law and statutory law, and that one's ignorance of
   it furnishes no exemption for criminal responsibility for his acts.

7. CONSPIRACY ⬳33—OFFENSES.
   In a prosecution under Criminal Code, § 37, for conspiring to defraud
   the United States by obtaining by false manifests clearances for vessels
   which misstated their destination, it is no defense that defendants had
   no knowledge of the unlawfulness of the object of their conspiracy; and
   this is so, though their acts were only malum prohibitum.

8. COMMERCE ⬳21—SUBJECTS OF—SHIPPING.
   Under the power to regulate commerce with foreign nations and among
   the several states, Congress has the right to determine the condition
   upon which ships or persons and merchandise may enter or depart
   from those places designated as ports.

9. SHIPPING ⬳13—"CLEARANCE"—NATURE OF.
   A "clearance," the form and issuance of which is prescribed by Rev.
   St. §§ 4197–4201 (Comp. St. 1916, §§ 7789–7793), contains the name of the
   master, of the vessel, and of the port to which it is going, and is in effect
   a ship's passport; such documents having a history in maritime law
   extending over hundreds of years.

   [Ed. Note.—For other definitions, see Words and Phrases, Second
   Series, Clearance.]

10. SHIPPING ⬳13—"PORTS"—WHAT ARE.
    While Rev. St. §§ 4178, 4334 (Comp. St. 1916, §§ 7758, 8083), declare
    that the word "port" may mean the place where a vessel is built, or
    where one or more of the owners reside, a "port," in ordinary signifi-
    cance, is a place where ships are accustomed to load and unload goods,
    or to take on and let off passengers, and where persons and merchandise
    are allowed to pass into and out of the realm, and implies that it is
    something more than a roadstead; therefore a place on the high seas,
    fixed by latitude and longitude, where vessels were to be met and pro-
    visioned and coaled, is not a port.

    [Ed. Note.—For other definitions, see Words and Phrases, First and
    Second Series, Port.]

11. CONSPIRACY ⬳33—OFFENSES—DEFENSES.
    As Rev. St. §§ 4197–4201, require the furnishing of verified manifests,
    so that clearances can be issued to vessels proceeding to foreign ports,
    and require the manifests and clearances to state the port for which
    the cargo is destined, defendants, where they obtained four vessels in-
    tended to provision and coal German warships on the high seas, clear-
    ances stating that the cargo was destined to certain designated ports,
    cannot defeat a prosecution under Criminal Code, § 37, for conspiring to
    defraud the United States, on the ground that the points where the
    German war vessels were to be met were not ports; for, if those points
    could not be regarded as ports, the United States was defrauded, as
    the ports stated in the manifests were not those in which the cargoes
    were truly intended to be landed, and likewise, if the German war vessels
    could be regarded as ports, the same would be true.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

12. CONSPIRACY ⬤33—DEFRAUDING UNITED STATES—DEFENSES.

Where defendants conspired to obtain false clearances for vessels used to coal German war vessels on the high seas, they cannot defeat prosecution because the parties who verified the manifests were innocent of the real plans of the conspirators and supposed that the coal and supplies were to be carried to the ports named.

13. CONSPIRACY ⬤33—AGENCY—OVERT ACT.

Where defendants conspired to defraud the United States by obtaining false clearances for vessels intended to provision and coal German war vessels on the high seas, an overt act of any one of the defendants in pursuance of the conspiracy is binding on all in a prosecution for violation of Criminal Code, § 37.

14. CRIMINAL LAW ⬤410—DECLARATIONS OF AGENT.

The declarations and conduct of an agent within the scope and within the course of his agency are admissible as original evidence against the principal, just as his own declarations or conduct would be admissible.

15. CRIMINAL LAW ⬤814(1)—TRIAL—REQUEST TO CHARGE.

A request to charge may properly be refused, where it has no relation to any issue which has arisen in the case.

16. CRIMINAL LAW ⬤814(5)—TRIAL—INSTRUCTIONS.

In a prosecution for conspiracy to defraud the United States by obtaining false clearances for vessels intended to provision and coal German warships on the high seas, where it was alleged that defendants made false manifests, a requested instruction that there was no evidence that any clearance was issued which contained any statement of the nature of the cargo or its destination is properly refused; that question not being germane to the issue.

17. CRIMINAL LAW ⬤763, 764(6)—JURY QUESTION.

In such case, where one of the defendants supplied with stores a vessel which cleared under false masters' and shippers' manifests, the question whether any inference could be drawn against defendants on account of acts of the vessel or its officer after leaving port was for the jury, and a request that no such inference could be drawn was properly refused.

18. CRIMINAL LAW ⬤721½(1)—ARGUMENT OF COUNSEL—FAILURE TO PRODUCE EVIDENCE.

It is improper for counsel to comment on the failure to produce evidence which would not have been competent, or on failure to call witnesses who would not have been competent.

19. CRIMINAL LAW ⬤721½(2)—TRIAL—ARGUMENT OF COUNSEL.

As counsel has the right to comment on the absence of evidence which is in the possession of the opposite party, it was permissible, in a prosecution against defendants for conspiring to defraud the United States by obtaining false clearances for vessels intended to coal and provision German warships on the high seas, for counsel to comment on the act of defendants in delivering to the German Embassy documents and codes relative to the transaction, where defendants' counsel stated that no effort had been made to obtain possession of such papers, for defendants, by their delivery to the Embassy, placed it out of the power of the prosecution to obtain possession of the same.

20. CONSPIRACY ⬤45—EVIDENCE.

Where one of the defendants, all of whom were charged with conspiring to defraud the United States by obtaining false clearances for vessels intended to provision and coal German warships on the high seas, reimbursed the owner of a chartered vessel, who paid the fine imposed on the master for making false statements in the manifest, that transaction is admissible on the question of defendant's knowledge of the statements and their falsity.

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

21. CRIMINAL LAW ⬅☞827—TRIAL—INSTRUCTIONS—REQUESTS.

Where a judge has delivered his charge, he is entitled to have his attention called either to errors or omissions in the same, and cannot be required to look through a large number of lengthy requests, and determine whether they were all covered by the charge given.

In Error to the District Court of the United States for the Southern District of New York.

The Hamburg-American Steam Packet Company, otherwise known as the Hamburg-Americana Line, and Karl Bunz and others, were convicted, under Criminal Code, § 37, of conspiring to defraud the United States, and they bring error. Affirmed.

The plaintiffs in error are hereinafter referred to as defendants. Hamburg-Amerikanische-Packetfahrt-Acktiengesellschaft is a German corporation engaged in maintaining and operating steamship lines throughout the waters of the globe. At the time of the trial Karl Bunz was the managing director of the above company for the United States. Among other positions he has occupied he has been German consul in Chicago, and from 1899 until 1908 consul general in New York. He then became German minister to Mexico, and still later was one of the counsel for his government before the tribunal at the Hague in the Venezuela arbitration. And at one time he was one of the controllers of an international board which managed the finances of Turkey. George Kotter was superintending engineer of the Hamburg-American Line, had been employed by that company for 26 years, and has been a resident of the United States for 9 years. Adolph Hachmeister had been in the service of the same company since 1884, and during the last 15 years had been its purchasing agent. Joseph Poppenhouse, indicted as "Walter" Poppenhouse, had been in the service of the company for 7 years and was a second officer of the Line, and engaged in the company's West India trade.

The defendants are all subjects of the German emperor. They are charged in two indictments with having conspired to defraud the United States. The gist of the offenses charged is that by false manifests, filed with the collectors of customs at various ports of the United States, they succeeded in having cleared from the ports where such false manifests were filed certain vessels laden with coal, engine room supplies, and provisions, which were to be transshipped at sea to German warships. It was charged, and so found by the jury, that the manifests were not complete, that they contained false points of destination, that it was never intended that the vessels should reach the points for which they respectively cleared, and that thereby, and by reason of the incomplete manifests, inaccurate and incomplete records were made by the collectors of customs at the ports from which said vessels sailed, and that a consequent fraud was committed upon the United States.

The jury returned a general verdict of guilty against each defendant. The Hamburg-American Company was sentenced to pay a fine of $1. Bunz, Kotter, and Hachmeister were sentenced to an imprisonment of one year and a half in the federal prison at Atlanta, Ga. Poppenhouse was sentenced to imprisonment in the same institution for one year and one day. From the judgment rendered, the defendants jointly and severally sued out writs of error, and the matter is thus in this court for review.

It appears that the German government and the Hamburg-American Line, considered by some to have been at that time the greatest ship line in the world, had an understanding some time in the winter of 1914 that the Hamburg-American Line would see that in case of war the German warships, which might be in the northern or southern part of the Atlantic, when in need of coal or provisions, would have them supplied in such quantities and at such times and places as should be indicated, and that the German government would communicate with Karl Bunz, one of the defendants, and the general representative of the Line in this country, with headquarters in New York City. On July 31, 1914, Bunz received a cable from his home

---

⬅☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

office in Hamburg and at once conferred with Kotter, another defendant, as to securing neutral steamers to carry coal. Upon Kotter's suggestion it was agreed to call in one Gans, since deceased, who was asked whether he had any neutral steamers that would be available for their purposes, and he agreed to furnish nine such vessels, which Bunz agreed to charter. As he could not get from Gans all the steamers he needed, Bunz took three additional vessels from among those owned by the German-American Line. Gans brought the charter parties to Bunz, who signed them. In the case of one or two of the ships which Gans furnished the owners were fearful of war risks and wanted bonds of indemnity, and Bunz signed the bonds. He testified that he did this very unwillingly. "I did it," he said, "very unwillingly. I did not like it at all, but I did it. I had to, because I had no other ships to take." The ships having been secured, it was necessary to load them with the coal and other supplies needed, and Bunz intrusted to Kotter the responsibility of obtaining and loading the coal. Hachmeister, another defendant, agreed to become responsible in like manner for necessary provisions and supplies. The German government from time to time cabled Bunz where his vessels could meet the German warships, and this information Bunz communicated to Kotter. Bunz testified that either Kotter or Gans called his attention to the fact that, in order to get the ships out of the harbor of New York and start them on their voyage, it would be necessary to have a port of destination agreed upon. They therefore got out their maps and found what was a convenient port of destination for those points on the Atlantic where the ships were to meet. "So that," as Bunz testified, "the ships we sent out would be on their way to those ports when met, if they fortunately were, by the German ships out there at sea, to our best judgment. * * * I intended that they should land and dispose of their cargoes there (the designated ports of destination), unless in the meantime my government had requisitioned them upon the high seas." There was some talk as to clearing the ships, and when that question was raised Bunz said that "it certainly ought not to be done by the Hamburg-American Line." He believed "that, if we cleared the ships in our name, they would be captured or destroyed by our enemies, and that they would not get very far before they were captured or destroyed."

On the cross-examination of Bunz questions were asked and answered as follows: "Q. Mr. Bunz, as a matter of fact, you intended to send those boats loaded to meet the German warships, no matter what happened, didn't you? A. To meet the German warships or any merchant vessel that was in need of something of that kind. Q. It did not make any difference what happened, you wanted those boats to go there and reprovision and recoal those ships, didn't you? A. That was my intention, if I could, to send them to those boats." He also testified that, having met and reprovisioned and recoaled the German vessels, it was his intention that the ships which had thus unloaded their cargoes should proceed empty to the ports of destination for which they were cleared.

The defendant Kotter testified that, when they sent the ships out, they did not send bills of lading for the cargo to any one in the ports designated in the clearance papers.

Hachmeister, another defendant, had been, as already stated, the purchasing agent of the Hamburg-American Line for 15 years, and when one of the ships of that Line was about to start on a voyage had ordered provisions and supplies needed for the voyage, sometimes amounting to $50,000 or $60,000 a ship. He admitted on the stand that on July 31, 1914, he had been summoned to Bunz's office, where he met Bunz and Kotter, and was "told that war had been declared and that we were to perform certain duties." Bunz, he said, gave him a list of the provisions and engine room supplies, showing what each ship that was to be sent out would need, telling him "to buy these articles for the ships as they would be sent." "He [Bunz] told me the ships were going to take coal and provisions and supplies." Hachmeister admitted that he bought the provisions and supplies that were put on board the ships. He admitted that the provisions and supplies, amounting to $3,500 or $4,000, which were put on the Thor, did not

appear in the shipper's manifest. His explanation of this omission was as follows: "The brokers who were clearing did not ask me for a list of the provisions. No one told me that provisions had to be listed. I did not believe that it was my duty to give to the brokers who were clearing the ships a list of the provisions and supplies I was putting on board. The matter did not occur to me at all." He gave the same explanation concerning like omissions in the manifest of some of the other ships. But on August 7th in the case of the Heina he says he learned for the first time that it was necessary to furnish a list of supplies for the manifest, and that after that he always furnished a correct list. On cross-examination he admitted that he knew that manifests had to be made out for cargoes, and that he had known it for many years, and that he had known for years that every item of cargo had to be made out on a manifest and sent to the custom house; and he explained his earlier statements by saying that he had considered the provisions and supplies he had furnished and not listed as ship's stores, which do not have to be listed. He admitted that he knew from the beginning that what he bought was intended to be delivered to the German ships at sea. He was then asked, "How could they be ship's stores?" and replied, "Well, I never gave it a thought."

Poppenhouse, another of the defendants, took the stand in his own defense, and testified that Kotter informed him that he was to go as supercargo on the Berwind, and gave him a letter of introduction to the captain of that vessel, informing the latter that Poppenhouse was to take the vessel to a certain position, which was marked and was about 40 miles north of the Island of Trinidad, off the coast of Brazil, and was to cruise up and down there for some time, and that he very likely would meet some German merchants or navy ships, and, if they needed coal or supplies, that he was to give them all they needed, and after he had done that he was to proceed to his port of destination, which was Buenos Ayres, and then report for orders. This letter was in German and typewritten. After he got to sea, he testified, "I marked down the position I was to go to, or I made a memorandum of it, and then tore up and threw overboard the letter of instructions. I knew what would happen if a British boarding officer of a man-of-war came on the ship and found me with that letter of instructions in the German language. I was sure that I would be taken out; in case the ship should be searched by a hostile one, I should have been taken off as a prisoner of war." This man was authorized to give even the captain orders as to the course of his navigation. The captain testified that he had never before had a supercargo on his vessel who directed the course of his navigation. On cross-examination Poppenhouse testified as follows: "I had no papers at all. If I was forced to, I would certainly have directed the captain to show him the ship papers. I knew the value of a good, clean clearance. I knew that a clearance with the seal of the United States on it was a very valuable paper, in the event that we were boarded by an officer of a foreign belligerent ship. I knew that, when I showed the officer that boarded my ship a clearance issued under the seal of the United States that I was bound for Buenos Ayres with a cargo, he would pay great attention to that paper."

On August 5, 1914, one Kulenkampf, a German subject and a member of a commission firm in New York doing an extensive business with South America, was summoned to the office of the Hamburg-American Line, where he met Bunz, Kotter, and Hachmeister. They informed him that they were anxious to clear the cargo on two steamers, the Lorenzo and the Berwind, which they wanted to have sail that night. They told him that the Hamburg-American Line did not like to appear as the shippers of the cargoes, and they requested that he clear the cargo for them. They impressed on him the necessity of quick action, as the custom house closed at 4 o'clock and it was then half past 3. At first he objected, but was told "that it had to be done, and he agreed to do it," saying that his firm was doing business all the time with South America, and that it would appear to be in the natural course of business for him to be making shipments to Buenos Ayres. They told him that the manifests which he was to swear to were ready, and that the vessels were to go, one to Buenos Ayres and the other to La Guayra.

He was informed that the vessels would carry coal, and nothing was said as to provisions or supplies, although provisions to the value of $9,687.80 went on the Berwind, and engine room supplies to the amount of $2,632.27 went on the Lorenzo. He was thus induced to swear to manifests which named ports to which it was not intended the cargoes should be carried, and which did not disclose any of the cargo except the coal.

The captain of the Berwind testified that on the day the vessel was started on her voyage he was instructed to go over to the custom house to see about her clearance. When he arrived at the custom house an official of the Hamburg-American Line presented him with a manifest, which he was to sign, which showed only 2,000 tons of coal. His testimony is as follows: "I objected to signing it, knowing that we would have about 2,700 or 2,800 tons of coal, and there were some additional provisions to go on board, in the neighborhood of about 40 tons, more or less. I was informed that a supplemental manifest could be made later on, and it was all right for me to sign it and clear on that manifest, as it was after 5 o'clock when we cleared, * * * and they were anxious * * * to have the steamer sail that night." The Berwind proceeded to sea about 9 o'clock that night, flying the American flag.

The Berwind never got to Buenos Ayres. After it reached Trinidad it cruised around for 36 hours. It turned back and steered north on the same course it had come for 50 miles, and then turned around again and steamed back south 50 miles, and then north 50 miles, and then back south 50 miles when five German ships were met, and the Berwind discharged her entire cargo, and started, not for Buenos Ayres, the port cleared for, but for Rio Janeiro; and after she arrived at the latter port the captain received no further instructions from Poppenhouse, except that the latter advised him to try and get a cargo and return to New York.

Bunz testified that he had no intention of defrauding the United States or of violating the laws of this country. He was asked whether he had any intention of obtaining clearances by means of false manifests, and 'so deceiving the collectors of customs. To which he replied, "Oh, why should I? No." Then followed: "Q. Had you any intention of causing the United States to keep and transmit false records of the quantities and values of merchandise shipped from its ports? A. I am sorry; I never gave that any attention, as I perhaps should; I do not know. Q. Did you believe that whatever custom house formalities might be necessary to get these ships on the high seas would be fully met and complied with? A. I took it for granted that that would be done. I knew that by the rules of international law I had a perfect right to send out these ships to meet the warships of my country. I believed that in everything that I did in this matter I was acting strictly within the law, both of nations and of the United States. I had no doubt about it, even for a moment. It was no part of my purpose to violate any law of the United States, whatever."

Kotter testified that he had no intention of injuring or defrauding the United States in any way, and had no intention of obtaining from collectors clearances by false manifests. To the same effect was the testimony of Hachmeister and Poppenhouse. The latter testified that he had nothing to do with the clearance papers, and never saw them.

One of the steamships chartered in this enterprise was the Unita, at the time at Newport News. She was brought to Philadelphia, and the captain, a Norwegian by birth, was then informed that he was to load coal and provisions for Cadiz, Spain. He went to the custom house, in Philadelphia, and swore to the manifest, stating Cadiz as his port of destination. The day after he got to sea he had a talk with the supercargo, about which he testified as follows: "I met the supercargo on the bridge, and he said to me, 'Do you know where you are going, Captain?' I says, 'Yes, I am going to Cadiz.' He says, 'No; you have got to go down where the men-of-war are'—down to where some of the German men-of-war are, off the western island. I says, 'There is nothing doing.' I did not say anything more that day, before the next day; then he commenced to offer me money. That day he did not offer

me more than $500. I said I would not do it for money. He wanted me to go down to the German men-of-war with this cargo of mine. It would not be far off my course, 200 miles. He never said anything more. Yes, a couple or three days afterwards, I think it was, he promised me $10,000 if I would go. I said 'No.' I did not say anything more. This was in the morning. In the evening I told him I was an English citizen, and I showed him my papers, and he never said a word. My officers said that the supercargo spoke to them. I did not hear it. When he offered me $10,000, I said I was going to Cadiz, as I cleared out for. I did go to Cadiz. When I got to Cadiz, I did not find any bills of lading there for goods." He lay in Cadiz for 27 days, the cargo finally being sold to the Spanish Trans-Atlantic Steamship Company. The ship had on board $18,830 worth of coal, $8,843 worth of provisions, and $2,900 worth of engine room supplies. This man on his cross-examination stated that he became a British subject in 1914, and that when the supercargo asked him to go out and supply German warships with coal and provisions he picked the wrong man.

Another of the vessels chartered was the Norwegian steamer Heina. The captain was requested to follow the orders of a supercargo, and the supercargo was instructed to allow him liberal gratuities "for attending to their interests." The captain testified that he swore to the manifest before the collector in Philadelphia, the port of destination named being La Guayra, and that when he swore to it he had no knowledge he was not going there. He had a cargo of approximately 4,400 tons of coal, the cost price being $3 a ton, and provisions to the value of $5,187.54, and supplies to the value of $3,680.22, as stated in the manifest. Instead of proceeding to his port of destination he was directed to go out of his course about 200 miles to the vicinity of Testigos Islands, and after cruising around there for 9 or 10 days, and failing to meet the German ships, the supercargo wanted the captain to go to a place in Venezuela called Crumpaho; but he refused to go, and declared he was going to his port of destination, and he proceeded to La Guayra, but did not discharge his cargo at that port. He started from there for St. Thomas, West Indies, being told by the supercargo to do so. He never got there, however, being captured by a French cruiser, and the cargo was confiscated by the French government.

The Fram and the Sommerstad, which were among the vessels defendants chartered for the enterprise they were engaged in, never sailed because of objections raised by the attorney for the owners of the vessel, who mistrusted the purpose of the charterers, and did not believe that the ships were intended to go to the designated ports, one to Pernambuco, and the other to Cadiz, Spain. When the attorney for the owners of these two vessels stated his suspicions and his fears, he was told by the defendant Hachmeister that the true mission of the vessels was to supply German warships off the Brazilian coast, and that the cargoes were not to be delivered at the ports set forth in the clearance. Bunz and Hachmeister then entered into certain written stipulations for the payment of indemnities for the ships in case of seizure, and they agreed to a waiver of the presence of supercargoes on board, although supercargoes for these two vessels had been previously selected and introduced to the masters. Hachmeister asked that the agreements should be put into a safe and not shown to the masters. But, notwithstanding these agreements, the attorney would not consent to the sailing of the vessels.

At the opening of the trial counsel for defendants asked to be permitted to make a statement for the purpose of saving time in the matter of proof. The following is an excerpt from his statement: "On or about August 1, 1914, Karl Bunz received directions by cable from the home office in Hamburg to send ships laden with coal, provisions, and supplies to various parts of the Atlantic Ocean, there to await for a reasonable time the possible appearance of German ships of war or merchantmen, to which, upon orders of their commanders, the coal, provisions, and supplies were to be delivered in such quantities as might be required. Karl Bunz undertook to comply with these instructions, and, with that end in view, issued the necessary orders to George Kotter and to Hachmeister, who obeyed them. The Hamburg-American Line owned, or chartered upon time charters, a number of steamships, bought coal,

provisions, and supplies, which were loaded upon these steamships, and caused, or attempted to cause, these steamships to sail from the ports of Newport News, New York, Philadelphia, New Orleans, and Pensacola, with the above-described object.  *  *  *  That is intended  *  *  *  to save the necessity of calling people who were on the ships to show that they cruised up and down waiting for German cruisers, or that they tried to escape from English or French cruisers, because it is freely admitted.  Our hope was that these ships would meet German ships and enable them to keep the seas by giving them coal and supplies."

The German-American Line, according to the testimony of both Bunz and Kotter, spent about $1,500,000 in this enterprise, the money being received through a New York banking house.

The jury was instructed as follows: "One or more of the following frauds must have been intended in order to find the defendants guilty: First, to procure a clearance; that is, by making a false manifest it would be a fraud, first, to procure a clearance; second, to procure a clearance which falsely stated the destination; third, to cause the collector of customs to make a false record of destination; fourth, to cause him to make false reports of the destination."

Walter C. Noyes and Howard S. Gans, both of New York City, for plaintiff in error.

Francis G. Caffey, U. S. Atty., of New York City, and John C. Knox, Asst. U. S. Atty., of New York City.

Before ROGERS and HOUGH, Circuit Judges, and LEARNED HAND, District Judge.

ROGERS, Circuit Judge (after stating the facts as above).  [1] The District Judge properly took it for granted at the trial that there was nothing inherently wrong in an undertaking by the defendants to provide coal, provisions, and supplies for German warships on the high seas, as the United States and Germany were not at the time at war with each other.  Neither the law of nations nor the municipal law of the United States prohibited such an undertaking.  The argument in this court properly proceeded upon the same assumption.  In Hall's International Law, p. 607 (Ed. of 1890), it is said that:

"The actual law of nations places no restriction whatever upon the purchase of provisions or of coals by a belligerent in neutral ports."

No one, we think, will seriously assert the law of nations prohibits trade between citizens of a neutral state and those of a belligerent state with which it is at peace.  As Lord Westbury expressed it:

"In the view of international law, the commerce of nations is perfectly free and unrestricted.  The subjects of each nation have a right to interchange the products of labor with the inhabitants of every other country.  If hostilities occur between two nations, and they become belligerents, neither belligerent has a right to impose, or to require a neutral government to impose, any restrictions on the commerce of its subjects."  Ex parte Chavasse, re Grazebrook, 34 L. J. (N. S.) 17.

And see Mr. Jefferson's letter of May 15, 1793, to the British Minister, who had complained of the purchase of arms in this country by an agent of the French government with an intent to export them to

France. Ford's Writings of Thomas Jefferson, vol. 6, p. 252. See, also, 1 Op. Atty. Gen. 63; Oppenheim on International Law (2d Ed.) vol. 2, p. 376; Journal du Droit International Prive, 1906, p. 928.

Two indictments were returned against the defendants. The first charged a conspiracy to obtain clearances by means of false manifests. The second charged a conspiracy to procure clearances which would falsely state the destination of the vessels, and the nature and destinations of the cargoes. In each indictment it is charged that the defendants unlawfully, willfully, corruptly, and feloniously conspired to defraud the United States in the manner and for the purpose therein stated. The two indictments were consolidated for purposes of trial.

[2, 3] The crime charged is that of conspiracy. It is a well-known fact that there are no common-law offenses against the United States. United States v. Hudson, 7 Cranch, 32, 3 L. Ed. 259; United States v. Eaton, 144 U. S. 677, 12 Sup. Ct. 764, 36 L. Ed. 591; United States v. Gradwell, 243 U. S. 476, 485, 37 Sup. Ct. 407, 61 L. Ed. 857. And the indictments herein involved have their basis in a provision of the Criminal Code, which is as follows:

"If two or more persons conspire either to commit any offense against the United States * * * in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned not more than two years, or both." Criminal Code, § 37; U. S. Comp. Statutes (1916) Ann. vol. 10, p. 12552, § 10201.

The provision in question does not use the word "corrupt" or "corruptly," although as we have seen the indictments employ it. The conspiracy charged is a conspiracy to defraud the United States. If the facts charged in the indictment are true, and that was a question for the jury, the defendants by the means described obtained from the officers of the government clearances for their vessels to which they were not entitled and without which their ships could not have left their ports. It needs no argument to make it plain that this amounted to defrauding the United States, and that the wrong was a grievous one.

In Haas v. Henkel, 216 U. S. 462, 30 Sup. Ct. 249, 54 L. Ed. 569, 17 Ann. Cas. 1112 (1910), the defendants were indicted and charged with having conspired to defraud the United States by causing to be issued at Washington by the Bureau of Statistics for the Department of Agriculture of false cotton crop reports. The court, speaking through Mr. Justice Lurton, in referring to the fact that the indictment did not expressly charge that the conspiracy included any direct pecuniary loss to the United States, said:

"But it is not essential that such a conspiracy shall contemplate a financial loss or that one shall result. The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government. Assuming * * * that this statistical side of the Department of Agriculture is the exercise of a function within the purview of the Constitution, it must follow that any conspiracy, which is calculated to obstruct or impair its efficiency and destroy

the value of its operations and reports as fair, impartial, and reasonably accurate, would be to defraud the United States by depriving it of its lawful right and duty of promulgating or diffusing the information so officially acquired in the way and at the time required by law or departmental regulation. That it is not essential to charge or prove an actual financial or property loss to make a case under the statute has been more than once ruled. [Hyde v. Shine, 199 U. S. 62, 81 [25 Sup. Ct. 760, 50 L. Ed. 90]; United States v. Keitel, 211 U. S. 370, 394 [29 Sup. Ct. 123, 53 L. Ed. 230]; McGregor v. United States, 134 Fed. 195 [69 C. C. A. 477]."

And see Curley v. United States, 195 U. S. 629, 25 Sup. Ct. 787, 49 L. Ed. 351; Id., 130 Fed. 1, 64 C. C. A. 369; United States v. Morse (C. C.) 161 Fed. 429.

[4] While, under section 37 of the Criminal Code, a mere conspiracy without an overt act is not punishable (Joplin Mercantile Co. v. United States, 236 U. S. 531, 35 Sup. Ct. 291, 59 L. Ed. 705; United States v. Rabinowich, 238 U. S. 78, 86, 35 Sup. Ct. 682, 59 L. Ed. 1211), still it is not necessary that it should appear that all the conspirators joined in the overt act (Bannon v. United States, 156 U. S. 464, 468, 15 Sup. Ct. 467, 39 L. Ed. 494). The Supreme Court has said, what other courts have frequently said, that conspiracies are seldom capable of proof by direct testimony, and that a conspiracy to accomplish that which is their natural consequence may be inferred from the things actually done. Eastern States Retail Lumber & Dealers' Association v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788.

That court has also more than once said that it is important to keep in mind in a case like the present that the character and effect of a conspiracy is not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. United States v. Patten, 226 U. S. 525, 544, 33 Sup. Ct. 141, 57 L. Ed. 333, 44 L. R. A. (N. S.) 325; Montague & Co. v. Lowry, 193 U. S. 38, 45, 46, 24 Sup. Ct. 307, 48 L. Ed. 608; Swift & Co. v. United States, 196 U. S. 375, 386, 387, 25 Sup. Ct. 276, 49 L. Ed. 518. The court has also said that by purposely engaging in a conspiracy which necessarily and directly produces a certain result they are in legal contemplation intending that result. United States v. Patten, 226 U. S. 525, 543, 33 Sup. Ct. 141, 57 L. Ed. 333, 44 L. R. A. (N. S.) 325.

[5] In 6 Cyc. 626, it is said, in stating the rule as to conspiracy, that "if the motives of the confederates are not corrupt no criminality can attach to the confederation." Bouvier's Law Dictionary defines corruption as being something against law, and illustrates its application by the case of a contract for usurious interest wherein it was "corruptly agreed," etc. In State v. Lehman, 182 Mo. 424, 81 S. W. 1118, 66 L. R. A. 490, 103 Am. St. Rep. 670, it was held that an act is done corruptly when it is done with an intent to obtain an improper advantage inconsistent with official duty and the rights of others. And in State v. Johnson, 77 Ohio St. 461, 83 N. E. 702, 21 L. R. A. (N. S.) 905, the court held that one who addresses a communication to the judges of a court for the purpose of influencing their decision in a case pending therein by disparaging one of the parties or the relator in a suit brought by the state "corruptly" endeavors to influence

officers of the court in the discharge of their duties. And we conclude that an act such as charged in the indictments is done corruptly when it is done with a wrongful intent to acquire some improper advantage for one's self or for another, and which is inconsistent with the rights of others. As the offense charged is that of conspiring to defraud the United States, the parties necessarily must have conspired "corruptly" as well as "unlawfully," "willfully," and "feloniously," if they conspired at all to defraud.

[6, 7] The principle is elementary that every one is presumed to know the law of the land, both common law and statutory law, and that one's ignorance of it furnishes no exemption from criminal responsibility for his acts. "Ignorantia juris neminem excusat" is a maxim in both civil and criminal jurisprudence which centuries of experience have approved. But this principle, it is claimed, has no application to the particular crime with which the defendants are charged. Criminal responsibility for a conspiracy, it is said, is not entailed by a plan which involves a violation of provisions of statutory law, if those who engage therein are ignorant of the existence of the statute, or of the interpretation thereof, which would render their plan unlawful. And we are told that it is clear on principle and settled by authority that where a corrupt intent is an element of the offense, and the existence of that intent is dependent upon a realization of a principle of law or of the existence of a statute other than that which defines the offense, ignorance of that principle of law or of that statute will constitute a defense. No doubt there are many cases in which it is held that, where a statute punishes the doing under particular circumstances of an act which in the absence of such circumstances is lawful, one who does the act under bona fide and nonnegligent ignorance or mistake as to the existence of such circumstances is not guilty, unless it appears that the Legislature intended that persons doing the act should act at their peril. 12 Cyc. 158. An illustration is Myers v. State, 1 Conn. 502, which was a case of letting a carriage on Sunday under the erroneous belief that it was to be used in a work of necessity or charity. In People v. Powell, 63 N. Y. 88, the court said:

"But, to make an agreement between two or more persons to do an act innocent in itself a criminal conspiracy, it is not enough that it appears that the act which was the object of the agreement was prohibited. The confederation must be corrupt. * * * The agreement must have been entered into with an evil purpose, as distinguished from the purpose simply to do the act prohibited in ignorance of the prohibition."

The indictment in that case charged certain officials with conspiracy to violate a statute which enjoined upon them the duty of advertising for such proposals as they might require in their department and in awarding the contracts therefor to the lowest bidder. There was evidence that the defendants did not know of the existence of the statute making it their duty to advertise; and the court held that persons who agree to do an act innocent in itself, in good faith, and without the use of criminal means, are not converted into conspirators because it turns out that the contemplated act was prohibited by statute.

The facts of that case have no resemblance to the facts of the case presented to this court. In that case the act complained of was innocent in itself. In this case the act complained of was not innocent, but dishonest and fraudulent. It consisted in obtaining clearance certificates for certain vessels stated to be bound for certain designated ports, by presenting to the collector of customs sworn manifests which falsely represented that their cargoes were to be landed at the ports named when the actual intention was not to carry the cargoes to such ports, but to German warships on the high seas. The clearances were obtained by means of false oaths, and those responsible were guilty of corrupt conduct. And in People v. Flack, 125 N. Y. 324, 26 N. E. 267, 11 L. R. A. 807, the court said that:

"The gist of the crime of conspiracy consists in a corrupt agreement between two or more individuals to do an unlawful act, unlawful either as a means or as an end. * * * The criminal quality resides in the intention of the parties to the agreement, construed in connection with the purpose contemplated. The mere fact that the conspiracy has for its object the doing of an act which may be unlawful, followed by the doing of such act, does not constitute the crime of conspiracy, unless the jury find that the parties were actuated by a criminal intent."

And the court goes on to say that, although the object of the agreement and the overt act may be unlawful, nevertheless the parties may have acted under a misconception or in ignorance, without any actual criminal motive in which case the jury should acquit.

Whatever may be the law of the state of New York as to criminal conspiracy, we are satisfied that as to the statutory crime of conspiracy, as defined in the Criminal Code of the United States, it is not necessary to show that the defendants who are alleged to have conspired to do an act which is only malum prohibitum had knowledge of the unlawfulness of the act. We think that the law was correctly stated in Chadwick v. United States, 141 Fed. 225, 72 C. C. A. 343 (1905), a case in the Circuit Court of Appeals in the Sixth Circuit in which Mr. Justice Lurton, speaking for the court, said :

"The indictment is for a statutory conspiracy to violate a penal statute of the United States. Knowledge that the act which it was the object of the conspiracy to do would be in violation of the law is imputed and need not be proven. Neither do we understand that in courts of the United States the fact that the object of the conspiracy was to do an act which is only mala prohibita requires evidence of knowledge of the unlawfulness of the act purposed by the conspirators. The conspiracy itself is one created by statute and is made out by evidence that its object was to perpetrate some offense against the United States."

And an instruction was sustained which informed the jury that the question of defendant's knowledge or her ignorance of the acts done being contrary to law—

"is not a fact which you have to consider. The only question for you to pass upon is whether the defendant violated the law; not whether she had any knowledge that she was violating the law."

[8-10] This brings us to a consideration of the clearances by the obtaining of which it is charged the United States was defrauded. In England it was a part of the king's prerogative to appoint ports and

havens, and thus determine the places for persons and merchandise to pass into and out of the realm. And in Blackstone's Commentaries, vol. 1, p. 264, it is said that:

"In England it hath always been holden that the king is lord of the whole shore, and particularly is the guardian of the ports and havens, which are the inlets and gates of the realm; and therefore, so early as the reign of King John, we find ships seized by the king's officers for putting in at a place that was not a legal port."

In the United States the power to regulate commerce with foreign nations and among the several states is vested in Congress, and that body has the right to determine the conditions under which ships, or persons, or merchandise may enter or depart from the ports which it has established, and those conditions must be conformed to. The ship before it leaves port must obtain its "clearance" from the collector of the port. Clearances have a history in the maritime law extending over hundreds of years. A clearance is an important document, even in time of peace. It is particularly so in time of war. It certifies to the fact that a vessel has complied with the law and is authorized to leave port. It contains the name of the master, of the vessel, and of the port to which it is going. It bears an official seal and is a ship's passport, which entitles it to go from one end of the sea to the other, except that it cannot enter a blockaded port. Its regularity is the first thing that is inspected in time of war when the boarding officer of a belligerent vessel boards the ship to determine whether she is on a lawful voyage.

It was essential to the success of the defendants' undertaking that they should obtain clearance papers which should falsely state that the cargoes were to be carried to certain ports which it was not intended they should reach. The false manifests which were presented to obtain the clearances were used because it was feared that no clearances would issue if the facts were truthfully disclosed. There was another reason. It was feared that, if they disclosed the facts, the information would not be kept secret, but would in some way become known to the English and French authorities, whose warships would defeat the success of the undertaking. And of course, if the true destination of the ships were disclosed in the clearances, their doom would be sealed if they happened to encounter a hostile ship of war.

The conditions under which a clearance may be obtained are specified in the statute and will be presently referred to. And if any vessel bound to a foreign port departs on her voyage to such foreign port without obtaining a clearance as required, the master or other person having charge of the command of such vessel is liable to a penalty of $500 for every such offense. Section 4197, U. S. Rev. Statutes 1878 (Comp. St. 1916, § 7789). A clearance, as said by Judge Hough in International Mercantile Marine Co. v. Stranahan (C. C.) 155 Fed. 428, 432, "is * * * the gracious permission of the sovereign to depart from a port into which, without like permission implied from an 'entry,' there was no right to come. In the United States this sovereign power is, by the commerce clause of the Constitution, lodged in the federal government, and the privilege of clearance is granted,

regulated, or withheld by statute." A statement concerning the statutory provisions which need to be considered may be found in an appended footnote.[1]

An examination of these provisions discloses that there is no authority to grant a clearance until a manifest is presented to the collector. It shows that it is a criminal offense to leave port without obtaining a clearance. It shows, too, that the master is required to make oath as to "the port or place" his vessel is bound to, and that the manifest must state "the port" for which the vessel is bound. It appears, also, that the master and shippers must state "the foreign port or coun-

[1] Section 4197 of the Revised Statutes of the United States 1878, provides that the master or person having the charge or command of any vessel bound to a foreign port shall deliver to the collector of the district from which such vessel is about to depart a manifest of all cargo on board the same and the value thereof, and shall swear to the truth thereof, whereupon the collector is to grant a clearance for such vessel and her cargo. And it provides that "if any vessel bound to a foreign port departs on her voyage to such foreign port without delivering such manifest and obtaining a clearance, as hereby required, the master or other person having the charge or command of such vessel shall be liable to a penalty of five hundred dollars for every such offense."

Then section 4198 of the Revised Statutes (Comp. St. 1916, § 7790) provides as to the oath of the master or commander of the vessel and declares it shall be as follows:

"District of          I (insert the name), master or commander of the (insert the denomination and name of the vessel), bound from the port of (insert the name of the port or place sailing from) to (insert the name of the port or place bound to, etc.)," etc.

And section 4199 of the Revised Statutes (Comp. St. 1916, § 7791) provides as follows:

"*Form of Manifest.* The form of the report and manifest to be delivered to the collector shall be as follows: Report and manifest of the cargo laden at the port of          , on board the          master, bound for          port," etc.

And section 4200 of the Revised Statutes (Comp. St. 1916, § 7792) provides as follows:

"*Manifest of Shippers.* Before a clearance shall be granted for any vessel bound to a foreign port, the owners, shippers, or consignors of the cargo of such vessel shall deliver to the collector manifests of the cargo, or the parts thereof shipped by them respectively, and shall verify the same by oath. * * * And before a clearance shall be granted for any such vessel, the master of that vessel, and the owners, shippers, and consignors of the cargo, shall state, upon oath, to the collector, the foreign port or country in which such cargo is truly intended to be landed. The oaths shall be taken and subscribed in writing."

And section 4201 of the Revised Statutes (Comp. St. 1916, § 7793) provides as follows:

"*Form of Clearance.* The form of a clearance, to be granted to a ship or vessel on her departure to a foreign port or place, shall be as follows:

"District of          
    "Port of          } ss.:

"These are to certify all of whom it doth concern, that          , master or commander of the          , burden          tons, or thereabouts, mounted with          guns, navigated with          men,          built, and bound for          having on board          , hath here entered and cleared his said vessel according to law.

"Given under our hands and seals, at the custom-house of          , this          day of          , one thousand          , and in the          year of the Independence of the United States of America."

try in which such cargo is truly intended to be landed," while the clearance simply states that the vessel is "bound for ———," which is to be understood as the "port or place" named in the master's oath, or "the foreign port or country in which such cargo is truly intended to be landed." Now, the record discloses that the oath of the master of the Marina Quesada declared that all of the cargo of 6,565 tons of coal would be "discharged at Valparaiso, Chile, the foreign port to which consigned, and no other." A similar oath of the shipper was also filed. The record does not contain the masters' oaths in the other cases. But it contains the shippers' manifests in the cases of the Berwind, the Lorenzo, the Thor, the Unita, the Sommerstadt, the Fram, the Heina, the Mowinckel, and the Nepos; and it contains the masters' manifests of the Mowinckel, the Heina, the Unita, the Sommerstadt, the Fram, and the Thor. In none of the manifests, whether made by the shippers or the masters, is the fact stated truly as to the destination of the ships, or the ports at which the cargoes "were truly intended to be landed."

Was the place on the high seas, fixed by latitude and longitude, where the German ships were to be met, a "port," within the meaning of the act of Congress under consideration? A "port" is defined in the Century Dictionary as follows:

"Specifically, in law, a place where persons and merchandise are allowed to pass into and out of the realm, and at which customs officers are stationed for the purpose of inspecting or appraising imported goods. In this sense a port may exist on the frontier, where the foreign communication is by land."

In Carver's Carriage by Sea it is said that:

"Perhaps it is not possible to give an exact definition of what constitutes a 'port' for loading or discharging; but, that a place may be a port, it seems that it should have somewhere for vessels to lie safely, and a shore where goods may be safely landed; also that there should be some conveniences for trade, such as wharves and warehouses, and that it should be a place to which vessels are allowed to come by the government of the country."

In Packwood v. Walden, 7 Mart. N. S. (La.) 81, 88 (1828), it is said that by the Roman law a port is defined to be "locus conclusus, quo importantur merces, et unde exportantur." D. 50, 16, 59. The definition in the eighth law, title 33, part 7, is nearly similar to the Roman Digest. That found in the Curia Phillipica, p. 456, No. 35, states a port to be:

"A place either on the seacoast or on a river, where ships stop for the purpose of loading and unloading, from whence they depart, and where they finish their voyages."

In Cockey v. Atkinson, 2 Barn. & Ald. 460 (1819), an action was brought upon a policy of insurance upon a vessel "to any port or ports whatsoever and wheresoever." The court said that they thought the words ought to be construed the same as if they were "place or places," and that under them the vessel might lawfully unload or take in goods in an open roadstead. The court added that, if there had been any improper conduct in the master in loading or unloading at a dangerous or unusual place, it might alter the case. But in this case the place was the usual place of loading at the Island of Graciosa.

And see Sea Ins. Co. of Scotland v. Gavin, 4 Bligh (N. S.) 578 (1829). The term "roadstead," as here used, means a place near the shore where vessels may anchor, differing from a harbor in not being sheltered.

In Sailing Ship Garston Co. v. Hickie & Co., 15 Q. B. Div. 580 (1855), the meaning of the word "port," as used in a charter party, was discussed at considerable length, and it appears from what is there said that its meaning may be one thing in a charter party and a different thing in an act of Parliament; that it may have one meaning in a business or commercial sense and another meaning in a fiscal sense. In his opinion Brett, M. R., said:

"What do you go to a port for? Because you want either to load or unload goods. Every one who understands ships knows that you cannot conveniently load or unload goods in a place where the ship itself would be in danger. Therefore all people possessed of common sense, instead of taking their boats onto a beach on an open sea, where they might be knocked to pieces in a storm, go to what they call a port, which is always a sheltered place. It is a place of safety for the ship and the goods, whilst the goods are being loaded or unloaded. * * * The moment you can find that the loading and unloading of ships takes place at a particular spot, you may safely infer that the parties understood that spot to be within 'the port,' because, as a general rule, people do not load or unload goods outside a port. They do sometimes, but very seldom, and only under exceptional circumstances. If, therefore, you can find a place of loading and unloading, you have another safe rule."

And Bowen, L. J., declared it obvious that the word "port" could—

"not be treated as a term which is capable of any very rigid definition. * * * We are dealing with a word which has not a fixed sense. If you found in a commercial document that certain acts were to be performed within the limits of a borough, you would know that the word 'borough' is a term which has a fixed sense; but no one has ever defined the word 'port' in a fixed sense of that kind. * * * Taking all these things together, you must make up your mind in each particular case as to the sense in which ship owners and charterers would be likely to intend to employ the term 'port.' It becomes really, therefore, a question of fact."

In Cole v. Union Ins. Co., 12 Gray (Mass.) 501, 519, 74 Am. Dec. 609, a vessel in the open roadstead at the Chincha Islands for the purpose of taking in cargo was held not to be "at sea." In Gookin v. New England Ins. Co., 12 Gray (Mass.) 501, 506, 74 Am. Dec. 609, a vessel was held to have arrived at "a port of destination" upon her arrival at a similar open roadstead at Ypala for a like purpose. In De Longuemere v. N. Y. Fire Ins. Co., 10 Johns. (N. Y.) 120, the court held that the term "port" might be properly applied to places resorted to and used for the purposes of loading and unloading cargoes, although they were mere open roads, having no harbors.

In Ayer v. Thacher, 3 Mason, 153, 2 Fed. Cas. 269, Judge Story said that in the revenue laws of the United States the terms "port" and "district" are often used as of the same import. And see Hartwell Lumber Co. v. United States (C. C.) 128 Fed. 306. And the Revised Statutes expressly provide that the word "port," as used in sections 4178 and 4334 (Comp. St. 1916, §§ 7758, 8083), may mean the place where a vessel is built or where one or more of the owners re-

side.    See Ayer & Lord Co. v. Kentucky, 202 U. S. 425, 26 Sup. Ct. 679, 50 L. Ed. 1082, 6 Ann. Cas. 205.

From what has been said it appears that the word "port" is a somewhat indefinite term; that its meaning is not exact, but depends upon the connection in which it is used; that it has been employed to designate a place where ships are accustomed to load and unload goods, or to take on and let off passengers, and where persons and merchandise are allowed to pass into and out of the realm.    We find nothing in the cases examined which leads us to believe that a place on the high seas, where ships are not accustomed to stop, or to discharge or to take on cargoes, where vessels cannot anchor, and which is not a place of safety for either ship or goods, can be regarded as a port.

[11] It does not follow, however, that because the German warships were not a port the defendants did not defraud the United States, if they caused manifests to be presented to the collector which falsely stated that the cargoes were to be carried to ports which it was intended the cargoes should never reach.    If these warships could be regarded as ports the United States would have been defrauded because the manifests falsely stated other ports as those in which the cargoes were "truly intended to be landed."    And if the ships cannot be regarded as ports the United States has been defrauded, as the ports stated are not those in which the cargoes were "truly intended to be landed."    So that upon either theory the jury would be entitled to find that defendants unlawfully, willfully, corruptly, and feloniously conspired to defraud the United States by means of false master's and shipper's manifests, as charged in the indictment.

[12] The defendants are not helped by the fact that the parties who swore to the manifests were innocent of the real plans of the conspirators, and supposed that the coal and supplies were to be carried to the ports named therein.    In Hyde v. United States, 225 U. S. 347, 360, 32 Sup. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614, which was a case of conspiracy, the action of the officers of the government was to be induced or influenced, and the court held that it might be through deception, or through fraud, or through innocent agents and acts of themselves having no illegality, but effectually causing and moving official action to the consummation of the end designed and contemplated.

The uncontradicted evidence shows that these defendants undertook to send ships, with cargoes of coal, provisions, and other supplies, from American ports to places on the high seas indicated by the admiralty division of the German government, with the intention of meeting German warships to which the cargoes were then to be transferred.    The successful accomplishment of this purpose made it necessary for the defendants to obtain clearance papers for the ships, and to obtain these documents the evidence shows that manifests were presented to the collectors of the ports which stated as "the foreign port or country" in which the cargoes were "truly intended to be landed" ports to which the defendants never intended the cargoes should be taken, unless there was a failure of the enterprise for the accomplishment of which the combination was formed.

[13] And the court was justified in charging the jury that, if they were satisfied from the evidence and beyond a reasonable doubt that defendants had entered into a conspiracy which had for its object the performance of an act which would be a fraud against the United States, and which was followed by the doing of such act with the intent to deceive a collector of customs, the act being done by one or more of the conspirators to effect the object of the conspiracy, they were to find defendants guilty. There was no error in this. When any number of persons associate themselves together in the prosecution of a common plan or enterprise, lawful or unlawful, each member of the combination is constituted the agent of every other member, so that the act or declaration of each in furtherance of the common undertaking is the act or declaration of all, and is admissible as primary and original evidence against all. This principle, as the Supreme Court explained in Hitchman Coal & Coke Co. v Mitchell, 245 U. S. 229, 38 Sup. Ct. 65, 62 L. Ed. ——, decided at the present term, originated in the law of partnership, but is not confined to that class of cases, being of general operation and applied in criminal cases.

[14] And in like manner the declarations and conduct of an agent within the scope and in the course of his agency are admissible as original evidence against the principal just as his own declarations or conduct would be admissible. Barreda v. Silsbee, 21 How. 146, 164, 165, 16 L. Ed. 86. So that the fact that the false manifests were presented by persons other than defendants is quite immaterial, being at the instigation of the defendants, with the exception of Poppenhouse, who, as we have seen, sailed as supercargo on the Berwind. And while the evidence is clear that Poppenhouse had no part originally in the conspiracy, the evidence is abundant that he afterwards joined it, consciously intending to assist actively in carrying out its object.

[15] It was not error to refuse to charge:

"That the clearance papers required by the United States statutes to be carried by ships are not required by the laws of the United States to state the destination of cargo; and in the absence of a request to that effect from the master of a ship, such clearance papers need not state the character of the cargo."

A request to charge may properly be refused which has no relation to any issue which has arisen in the case. Bird v. United States, 187 U. S. 118, 23 Sup. Ct. 42, 47 L. Ed. 100.

[16] And for a like reason there was no error in refusing to charge:

"That there is no evidence in this case that any clearance was issued which contained any statement of the nature of any cargo or its destination."

The issue related to defrauding the United States by presenting false manifests, thereby wrongfully obtaining the clearances. We are concerned with what the manifests contained, rather than with what the clearances contained.

[17] It is assigned as error that the court refused a motion made on behalf of the defendants at the close of the entire case to strike

out certain testimony with regard to various and sundry transactions relating to the sailing of a certain vessel known as the Gladstone, and otherwise known as the Marina Quesada, and to acts done by sundry and divers persons in causing the vessel to sail and to be cleared from the ports of the United States. The ship sailed from Newport News on December 15, 1914, three months after the last of the other ships chartered by the Hamburg-American Line had put out to sea. She was laden with coal, and also carried provisions. and stores. The object of the voyage, as the testimony showed, was to meet the German ships on the high seas. The steamer cleared for Puerto Montt and Valparaiso, Chile. She never reached Valparaiso; whether because she was captured or for some other reason is not disclosed. The government was permitted to show that, in addition to the articles manifested, she carried a couple of cases of revolvers, which her captain caused to be kept out of sight in his cabin, and that shortly after she passed beyond the three-mile limit she rigged up a wireless outfit, and that she changed her name at sea, and concealed her papers, and pretended a loss of them at sea. The evidence showed that defendant Hachmeister was in Newport News in August at the office of certain ship chandlers, that later he sent a telegram to these ship chandlers ordering supplies, and directed that these supplies be turned over to the captain of the Gladstone, who had a letter to that effect from Hachmeister. These supplies were ordered about August 24th and were delivered to the captain in December. The evidence also disclosed that upon December 16th the captain wrote to Hachmeister, confirming a telegram in which he asked the Hamburg-American Line to honor his draft for $1,000 for supplies he purchased from this firm of ship chandlers at Newport News. Hachmeister testified that he was surprised at the drawing of the draft, and that he spoke to defendant Kotter about it, who said:

"Well, I suppose we will have to give them the assistance required by him, and pay the $1,000."

And Hachmeister said he paid the draft. And there is a letter written by Hachmeister in which he remits $421.75 on behalf of the Hamburg-American Line to the ship chandlers for goods supplied to the Gladstone. It is objected that there is no evidence which establishes that the defendants, or any of them, had exercised any control over the clearance or the subsequent activities of this vessel. And the court was asked to charge:

"That defendants are not chargeable with any of the acts committed by the Gladstone (known also as the Marina Quesada), or any of its officers, and no inference can be drawn against any of the defendants by reason of such acts."

The request was not granted, and the court in its charge made no reference to the Gladstone, or to the acts of those in charge of her. Of course, the issue was whether the defendants had knowledge of the false clearance of this vessel and were in any way responsible therefor. It is perfectly certain that she cleared under false master's and shipper's manifests, and that Hachmeister supplied her with stores. We think the request to charge was properly refused. It was some evidence, and the weight of it was for the jury to determine.

[18, 19] There was no error in refusing to charge:

"That the jury must not draw any inference hostile to these defendants, or any of them, because of the failure by them, or any of them, to produce documents in the possession of the ambassador to the United States of the imperial government."

The instruction requested related to letters, cables, and other papers embodying the understanding existing between the admiralty division of the German government and the Hamburg-American Line as to the coaling and provisioning of the warships and as to what was done in connection therewith. These papers, it was admitted at the trial, were transferred to the German embassy by the defendant Bunz on July 31, 1914, he having been requested to do so by the embassy when it became known that the matter was attracting public attention. And counsel for defendants stated that not the slightest effort had been made to obtain the consent of the embassy to have the papers brought into court, although the defendant Bunz had been asked by his counsel on his direct examination to state orally some of the contents of the papers, to which counsel for the government duly objected. The District Judge in his original charge made no comment on the failure to produce the papers in court, but counsel for the government in addressing the jury commented unfavorably upon the fact that defendants had not produced the papers nor made any attempt to obtain them. It was this which led to the above request to charge. And at the conclusion of the charge counsel for defendants also requested the court to charge:

"That there was no legal process available to these defendants, or any of them, to compel the production upon this trial of any documents in the possession or custody of the ambassador of the imperial government to the United States."

Thereupon the District Judge said:

"Gentlemen of the jury, I will charge that as the law, for the purposes of this case; but you will bear in mind that the evidence tends to show that these documents were voluntarily turned over to the ambassador, and, as I recall Mr. Wood's [attorney for the government] argument, it was that no attempt had been made by the defendants to get the documents back. Whatever signification that has is for you to determine."

It may be admitted as a general rule that, in order that an invidious inference may be drawn from the failure to produce a document, the document should be within the control of the party against whom the inference is sought to be drawn. We nevertheless think that, where a party who has in his possession documents which would throw light upon the entire matter, knowing that it is probable that it will be before the courts, voluntarily deposits the documents where international law does not permit the government to reach them, an invidious inference may be drawn from that fact. It is not an unwarranted inference that, if the defendants made no effort to obtain the documents from the German embassy for use upon the trial, it was because they would not have been helpful to their defense. And if the reason why they made no effort to secure them was because the German cipher would have been disclosed, that explanation for their

nonproduction should have been made, and an opportunity afforded for the use of translations under such safeguards as might be prescribed. Under the circumstances we think counsel had a right to comment on the failure to produce the papers.

The case of Graves v. United States, 150 U. S. 118, 14 Sup. Ct. 40, 37 L. Ed. 1021, upon which defendants rely, is inapplicable to the facts of this case. In that case, the defendant being on trial for murder, the district attorney commented on the absence from the court-room of the prisoner's wife, who had been with him at a time when her husband was seen by a witness for the prosecution. As the wife was an incompetent witness, either for or against her husband, the court held the comment was quite improper, and reversed the judgment of conviction. The rule is elementary that it is improper for counsel to comment on the failure to produce evidence which would not have been competent. Blaisdell v. Davis, 72 Vt. 295, 48 Atl. 14; Shaw v. Gilbert, 111 Wis. 165, 86 N. W. 188. And it is equally improper to comment on the failure of the adverse party to call witnesses where such witnesses are incompetent. Laird v. Laird, 127 Mich. 24, 86 N. W. 436; Wright v. Davis, 72 N. H. 448, 57 Atl. 335. But counsel have the right to comment on the absence of evidence which is in the possession of the opposite party, which should naturally be introduced. Huntsman v. Nichols, 116 Mass. 521; Concord Land & C. Co. v. Clough, 70 N. H. 627, 47 Atl. 704; Whitehead v. Wisconsin Central R. Co., 103 Minn. 13, 114 N. W. 254, 467. And where, as in the instant case, a party puts out of reach documents which were in his possession, which relate to the offense with which he is charged and for the obvious purpose of putting them out of reach, he certainly is not entitled to complain if the court informs the jury that it may determine the significance to be attached to the suspicious conduct. The court was quite right in saying what it did, and saying that counsel had a right to comment on the failure to produce the papers.

There was no error in refusing to charge as follows:

"Even if you should be convinced beyond a reasonable doubt that one or more of the defendants conspired or agreed among themselves or with other persons to present to a collector or collectors of customs manifests which should be false in the particulars described in the indictment, it would be your duty to acquit the defendants of the crime charged in the indictments unless you were also convinced beyond a reasonable doubt that in entering into this agreement they intended to defraud the United States and to deceive the collector or collectors of customs in the manner set forth in the indictments."

[20] There was no error in refusing to charge that:

"No inference may be drawn against any of the defendants in this case from the fact that a fine was imposed upon Capt. Falkenberg for deviation."

And there was no error involved in the admission of evidence that Capt. Falkenberg of the Berwind, upon which defendant Poppenhouse had sailed as supercargo, had been fined $500 by the customs authorities for making a false statement in the manifest upon the faith of which he obtained the clearance of his ship, which was one of those chartered for this enterprise, and that the New York & Puerto

Rico Steamship Company, which owned the ship, paid the fine and that this company was afterwards reimbursed by the Hamburg-American Line, one of the defendants. This evidence was clearly admissible. It afforded strong confirmation of the government's theory that defendants had pre-existing knowledge of the falsity of the manifests and of their complicity with Falkenberg. If they had not been privy to the falsity of the manifest, it is hardly to be supposed that they would have relieved him of the fine justly imposed upon him for his misconduct.

[21] It has frequently been pointed out that, if instructions are to have any useful effect on the minds of jurors, they should be as few and short and pointed as is consistent with giving the jury a clear idea of what it is they have to determine. Numerous instructions do not tend to enlighten the minds of jurors on the issues submitted. They only tend to confusion. There is some authority for saying that, where an unreasonable number of instructions is presented, the court may refuse all of them. Chicago Athletic Association v. Eddy Electric Mfg. Co., 77 Ill. App. 204. In the instant case the defendants preferred 66 requests to charge, covering 13 printed pages of the record. And the forty-ninth request includes one sentence containing 240 words. The record does not disclose that any of these requests were specifically called to the attention of the court, and taking the whole 66 together they amount to the writing of a charge for the trial court. We have some doubt whether the District Judge was even called upon to read such a mass of matter as was dumped upon him in this case. After he delivered his charge, we think he was entitled to have his attention specifically called either to (a) some error in his colloquial charge, or (b) some specific thing that he had omitted therefrom. He is not called upon to go through a book of requests, and make up his own mind as to whether there is something that he has left out, and then have it alleged for error (after dumping said book of requests upon him) that he did not charge this or that single request, upon which no stress was laid at the time.

The assignment of errors in this case number 191. We have examined them with the care which the importance of the case demands. The most important of them have been specifically considered, but the length of this opinion forbids the specific consideration herein of the others. It must suffice to say that in none of the assignments which learned counsel has brought to this court's attention do we find any prejudicial error for which the judgment of conviction should be reversed.

Judgment affirmed.