## BYRON v. UNITED STATES. *

### (Circuit Court of Appeals, Ninth Circuit. July 7, 1919.)

### No. 3246.

1. POST OFFICE ☞48(4)—USE OF MAILS TO DEFRAUD—INDICTMENT.
   That allegations, in an indictment, show that representations made by defendants to persons whom they sought to defraud by means of a scheme carried out by use of the mails were inconsistent with each other, does not render the indictment bad.

2. POST OFFICE ☞35, 49—USING MAILS TO DEFRAUD—EVIDENCE.
   On trial of a defendant for using the mails to defraud by inducing persons to make application through him to purchase public lands under the Timber and Stone Act, evidence that he represented that certain things were not necessary to obtain a patent which were required by the rules of the land office, of which applicants were not told, was admissible, and the representations cannot be justified on the ground that such rules were invalid.

3. CRIMINAL LAW ☞371(1)—OTHER OFFENSES—INTENT—USE OF MAILS TO DEFRAUD—EVIDENCE.
   On the trial of a defendant for using the mails in carrying out a scheme to defraud, evidence that he had previously defrauded other persons by means of a similar scheme was admissible, where limited to the question of intent.

4. PUBLIC LANDS ☞120—WOODS AND FORESTS ☞8—EFFECT OF CANCELLATION OF PATENTS—FOREST RESERVES.
   On cancellation of patents to public lands for fraud, the legal title becomes reinvested in the United States, where the equitable title remained, as of the date of the patents, and the land at once becomes subject to a prior act including it within the limits of a forest reserve.

5. WOODS AND FORESTS ☞8—TEMPORARY WITHDRAWAL FROM SETTLEMENT OR SALE—FOREST RESERVES.
   The authority given the President by Act June 25, 1910, § 1 (Comp. St. § 4523), to temporarily withdraw public lands from settlement or sale, includes such withdrawals for the purpose of including the land in a national forest.

In Error to the District Court of the United States for the District of Oregon; Charles E. Wolverton, Judge.

Criminal prosecution by the United States against Carlos L. Byron. Judgment of conviction, and defendant brings error. Affirmed.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Rehearing denied October 14, 1919.

P. V. Davis and E. M. Comyns, both of Seattle, Wash., for plaintiff in error.

B. E. Haney, U. S. Atty., and John J. Beckman, Asst. U. S. Atty., both of Portland, Or.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. Byron and Alley were indicted jointly for having devised a scheme to defraud and used the mails in furtherance of the scheme, in violation of section 215 of the Penal Code (Act March 4, 1909, c. 321, 35 Stat. 1130 [Comp. St. § 10385]). Alley was not apprehended, but Byron was tried and convicted under the five counts included within the indictment. He brought writ of error.

The scheme charged was as follows: The defendants, for the purpose of defrauding certain persons named and others unknown, and the public generally, called "victims," would fraudulently represent that they could procure for them patents and titles to certain lands in Oregon called "selected lands" and "patented lands," if the "victims" would pay to defendants certain moneys as location fees and expenses. Defendants had been successfully engaged in procuring, for applicants, title to such "patented' and "selected" lands located in Oregon, having great value for, timber thereon, by means of a procedure substantially as follows: It would be represented that the lands designated as "selected" were in the Roseburg, Oregon land district and had previously been selected by Hyde & Co. and one Kribs and other transferees under the Forest Lieu Selection Act of Congress of June 4, 1897, c. 2, 30 Stat. 11, 36 (Comp. St. §§ 5123–5134); that the manner by which the title to the base lands offered to the selector had been acquired was unlawful, and adverse proceedings were pending in the Land Department seeking to cancel the selection on the ground of fraud; that the result of such adverse proceedings would be the cancellation of all selections; that there were large tracts of other lands, designated as "patented," which were lands to which patents from the United States had previously been fraudulently obtained; and that the lands had been restored to the public domain by reason of a decision of the Supreme Court in certain equity suits wherein the United States was plaintiff, and the Linn & Lane Timber Company and others were defendants. The following misrepresentations were to be used with respect to these matters: That the "selected" and "patented" lands were open to patent and sale under the Timber and Stone Act June 3, 1878, c. 151, 20 Stat. 89. That those who filed through defendants' agency on such lands would receive patent and title within two years from the date of application. That persons who would make application for such lands through defendants would, by such applications and services to be rendered by defendants, obtain preference rights to purchase from the government at $2.50 per acre. That in order to get title to said lands it was necessary and proper to file applications in the Roseburg Land Office, and preference rights to purchase would be secured. That the United States asked $2.50 per acre and no more. That personal examination by

the applicant of lands applied for under the Timber and Stone Act prior to the filing of an application was not necessary. That, by reason of the services to be furnished by defendants, application for lands filed under the guidance of defendants would be allowed by the officers of the Land Office, and upon payment of $2.50 per acre the government would issue patent within two years from the date of application. That applications filed under the direction of defendants would be the first in point of time filed in the Land Office for the tracts applied for. The defendants would require the "victims" to pay from $100 to $1,000 each for their pretended services for locating them, and would then defraud the "victims" out of all their money so received and give them nothing in return therefor. That to induce the "victims" defendants would agree to furnish the services necessary to secure patents and that in the event of failure they would refund the moneys paid. That defendants would, by reason of their knowledge of public land laws, cause a reversal and change of certain rules and decisions of the Land Office authorities in Washington, and in that way secure title to such lands for the "victims." That defendants would represent that many other persons were anxious to make application for and secure patent to the said lands through the agency of defendants. To carry out the scheme, defendants would use the mails transmitting applications, letters, patents, notices of appeal, and other documents.

The indictment negatives the several alleged false representations and pretenses by setting up that the defendants never had succeeded in securing title for any one for either the said "selected" or "patented" lands by means of their procedure or otherwise; that the procedure was worthless; that it was impossible to initiate or secure preferences for the lands; that neither the "selected" nor "patented" lands were open to sale, selection, or entry under any of the public land laws of the United States, and applications for the same would be rejected; that the lands could not be purchased under the Timber and Stone Act for $2.50 per acre, and if open to entry could only be procured by payment of the appraised value thereof; that patent could not be secured for any lands under the Timber and Stone Act unless the applicant personally examined the land applied for within 30 days prior to filing the application; that every application filed would be rejected by the Land Office; that upon various tracts upon which the "victims" might file there had already been similar applications to purchase said lands, filed by others whose filings were prior; that defendants never intended to repay the moneys paid by the "victims"; and that any agreements for the return of moneys were made to induce the "victims" to believe that their money would be returned and to prevent them from discovering that they had been cheated and defrauded.

[1] It is said the indictment is fatally defective because of inconsistency between certain averments of the numerous representations made by defendants in furtherance of the scheme charged, in that the allegation that defendants would represent that, by reason of their pretended services, applications to purchase under the Timber and Stone Act would be accepted and allowed by the Land Office, is

contradicted by another allegation to the effect that defendants would represent that they could, by reason of their knowledge of the public land laws, cause a reversal and change of certain rules and regulations of the United States land authorities and the Department of the Interior, and in that way secure title to the lands.

In the scheme charged there may have been some seeming or real inconsistencies. Certain of the alleged misrepresentations would be used by the defendants in persuading one of the "victims" who might be defrauded, while others would be made to another; yet, if the scheme was as pleaded, the indictment was sufficient. That seems too plain for discussion.

It is said that the court erred in admitting testimony of a witness to the effect that Byron told him there were about ten million feet of timber on the land the witness applied for, and that, acting under the advice of Byron, witness had stated in his application that the land contained but one million feet. We see no error in the ruling. If the applicant in good faith relied upon and believed Byron's representation and did what Byron told him was necessary to acquire title, the competency of the evidence is not affected by the fact that the applicant endeavored to deceive the land officers of the government.

[2] It is earnestly argued that a personal examination of the land by an applicant previous to filing was not necessary, and that the Land Office regulations which require that the applicant shall personally examine the land previous to filing are contrary to law, and that therefore it was error to admit evidence that Byron had advised applicants that it would not be necessary for them to visit the land before filing. The view of the District Court was embodied in an instruction to this effect: That the Land Department by rule required that the applicant should personally inspect the land before filing; that the enforcement of the rule by the Land Department was a matter within its own control and was binding upon applicants until revoked or annulled, "so that a representation that it is not necessary for the applicant personally to inspect the land within 30 days previous to filing is not true, because the Land Department does not require it." It is to be remembered that the defendants, in executing the scheme charged, would induce the "victims" to believe that by filing upon the lands they would obtain a preference to obtain patent by paying $2.50 per acre to the government, the applicants also understanding that they were to obtain patents from the Land Office. Byron never informed them that the regulations with respect to personal inspection before filing was, in his opinion, in excess of the authority of the Land Department; nor did he tell them that unless regulations made by the Land Office were complied with the applications would be rejected. On the contrary, the applicants said that they paid Byron on the assumption that they would obtain patents, and it follows, we think, that if his representations with respect to inspection and price per acre were false and made with a view to have the applicants pay him the moneys which he obtained from them, and were acted upon, this evidence was competent and relevant, notwithstanding any possible question as to the validity of the rule of the Land Department. Durland v. United States, 161 U.

S. 306, 16 Sup. Ct. 508, 40 L. Ed. 709; Ness v. Fisher, 223 U. S. 683, 32 Sup. Ct. 356, 56 L. Ed. 610.

[3] The plaintiff in error objected to evidence that another similar plan was carried out by defendants where applicants for lands in 1914, 1915, and 1916, had paid money to Byron and had not been repaid. This evidence was admitted by the court solely for the purpose of aiding the jury in ascertaining the intent of the defendants in their conduct in the case on trial. For that purpose and under such limitations, it was competent. Riddell v. United States, 244 Fed. 695, 157 C. C. A. 143; Hallowell v. United States (D. C.) 253 Fed. 865.

By regulation of the General Land Office (1908), an appraisal of lands subject to entry under the Timber and Stone Act was made and a minimum of $2.50 per acre fixed as the sale price. Witnesses testified that Byron gave them to believe that the lands could be had at $2.50 per acre. The regulation is said to be invalid and therefore that such evidence was improperly admitted. But the regulation was being enforced by the Land Office, and under the practice no patent could be had unless the price at which the land was appraised was paid, provided the appraisal was made within the time limited in the regulation. The District Court charged that the Land Department was enforcing the rule with respect to appraisement; that it controlled applications for the purchase of lands; and that a representation, if made, that the applicant could not be required to pay to exceed $2.50 an acre for the land, "is not true and not the law." Our opinion is that the question of the validity of the regulation was not directly in issue, for if the defendant believed that his view as to the invalidity of the regulation was sound, yet, if he knew of the rule and made the representations that he is charged to have made, intending to defraud the persons to whom he made such representations out of moneys which they would pay to him, and if he used the mails as charged, he would be guilty of a violation of the statute. Ness v. Fisher, supra; Virinda v. Vinson, 39 Land Dec. 449. The court, however, specially guarded defendants' rights by instructing that if Byron acted upon the advice of counsel, and if in good faith he sought legal advice and followed the same, he could not be convicted of crime, even though such legal advice were erroneous as to a true construction of the law.

[4] The situation with respect to the "patented" lands referred to in the indictment was as follows: In an equity suit entitled United States v. Linn & Lane Timber Company and C. A. Smith et al., brought in the United States court for Oregon in 1908, patents to certain lands were sought to be set aside. Decree of cancellation of the patents there involved was rendered in October, 1910, and the decree was affirmed by this court in May, 1912, and by the Supreme Court of the United States in March, 1915. Linn & Lane Timber Co. v. United States, 196 Fed. 593, 116 C. C. A. 267; Linn & Lane Timber Co. v. United States, 236 U. S. 574, 35 Sup. Ct. 440, 59 L. Ed. 725.

The Cascade National Forest was created by proclamation of March, 1907. The Santiam National Forest was created July 21, 1911, and included part of the Cascade National Forest. A portion of the lands involved in the equity suit heretofore referred to was within the ex-

terior boundaries of the Cascade and Santiam Forest Reserves, and the remainder of the lands included in the equity suit were outside of the limits of the Santiam Forest but contiguous thereto. In August, 1912, by executive order, the last-mentioned class of lands was withdrawn. Certain applications filed for these lands within the exterior limits of the forest were made through the solicitation of Byron and were at first rejected because the 'Land Office had not been notified that the lands had been restored to the public domain and were open to entry. Holt v. Murphy, 207 U. S. 407, 28 Sup. Ct. 212, 52 L. Ed. 271. Thereafter on April 20, 1916, after the Department of the Interior had notified the local land office that the lands had been restored to the public domain and were not open to entry because they were included in the Santiam Forest, other applications were filed through Byron's activities, and they, too, were rejected because the lands were included within the forest reserve. Plaintiff in error takes the position that, because these lands were patented at the time of the creation of the Cascade and Santiam Forests, they never became part of such forests, and therefore that upon cancellation of such patents the lands were restored to the public domain and ought not to have been held not open to entry under the land laws. But it appears that the Department of the Interior took the view that, when cancellation of the outstanding legal title was effective, title which had been acquired by fraud was reacquired by the United States, and that such reacquired title related back to the date when the legal title was lost, and that the United States was revested with a perfect title, to be regarded as if it had not been interrupted. The principle followed by the Land Department was that an order of reservation operates upon the equitable as well as the legal rights of the United States in the land, and that, if the legal right is subsequently canceled, an order of reservation made while legal title was outstanding is effective, "for the complete title is merely reunited where the equitable title was all the time." In Bradford v. United States, 222 Fed. 258, 138 C. C. A. 69, in a suit affecting the validity of patents to certain public lands, the court said the decree of the court declared void, canceled, and annulled the patents that had been issued and the conveyances made thereunder and restored to and declared the land to be the property of the United States. "This cancellation has the effect of wiping out as though never existing the patents and conveyances in question."

[5] It is argued that it was error on the part of the District Court to hold that lands embraced in an order of withdrawal made by the executive could include certain lands which had been awarded to the United States by decree of the United States Circuit Court of Appeals pending disposition by Congress and legislation looking to the inclusion of the lands within a national forest. The temporary withdrawal order was made August 13, 1912, and the authority for the order was found in the Act of June 25, 1910, c. 421, 36 Stat. 847 (Comp. St. §§ 4523–4525), which authorized the President temporarily to withdraw from settlement, location, sale, or entry any of the public lands and reserve the same for water power sites, irrigation or classifications of lands, or other public purposes to be specified in the orders of withdrawal. We do not find that the power of the President is as limited

as plaintiff in error argues it is, and in our opinion a temporary withdrawal, in order to include the land within a national forest, is within the general purposes contemplated by the statute. United States v. Midwest Oil Co., 236 U. S. 459, 35 Sup. Ct. 309, 59 L. Ed. 673. It is clear, under the record, that the Land Department held the lands called "patented" to be within the national forest and rejected the applications made through the instigation of Byron. Plaintiff in error well knew that, while the Land Department held the lands to be within a national forest, title could not be obtained; but, notwithstanding this knowledge, the evidence goes to show that Byron took money from the applicants with the intention of deceiving them and not refunding.

It is contended that the court erred in ruling that unapproved forest lieu selections, such as were involved upon the trial, operated to segregate the land selected from the general public domain, and that during the pendency of such selections other applications for the land selected would not be allowed. Again, in making such ruling the District Court was but recognizing the rule of the Land Office and the practice which has prevailed for many years. Santa Fé R. R. Co. v. California, 34 Land Dec. 12; O'Shee v. Coach, 33 Land Dec. 295. Of the practice Byron appears to have been fully cognizant, and, while there may have been some early decisions of the Land Department based upon a different practice, it is indisputable that the Land Department may make appropriate rules for the orderly administration of the public land laws, and under such power we believe the practice was not in excess of authority.

Error is assigned because the court made special reference to the testimony of a witness who was a member of the Board of Law Review of the General Land Office at Washington. This witness testified to certain practices of the Land Office with respect to contests and applications. A fair reading of the instruction complained of shows that the court did not mean to draw any invidious distinction between the testimony of the witness and that given by a witness for the defendant who testified as to his belief with respect to the consequences of filing by applicants upon certain public lands. The court indicated that it adopted the construction of the Land Office rule as testified to by the one witness, rather than that testified to by the other witness. We find no error in the course pursued.

There are in the many assignments references to some other points, but they are of less importance, and we find none of them well founded.

Judgment is affirmed.