SILKWORTH et al. v. UNITED STATES.*

(Circuit Court of Appeals, Second Circuit. February 1, 1926.)

No. 124.

**1. Indictment and information ⬅125(19).**

Indictment which set forth two modes of operation by which defendants planned and carried out their scheme to defraud *held* not duplicitous.

**2. Indictment and information ⬅125(19).**

Various means used in committing offense may be joined in indictment without duplicity.

**3. Indictment and information ⬅125(19)— Post office ⬅48(8)—More than one misrepresentation may be charged, as long as they are part of same scheme, and proof of one will sustain indictment (Criminal Code, § 215 [Comp. St. § 10385]).**

Under Criminal Code, § 215 (Comp. St. § 10385), more than one misrepresentation or pretense may be charged in indictment, so long as they are part of the same scheme, and may be set forth in one count, and sufficient averment and proof of one will sustain the indictment and warrant conviction.

**4. Indictment and information ⬅2(2), 119— Allegation found to be unintelligible as to means of carrying out scheme might be regarded as immaterial or surplusage, when another means alleged (Const. Amend. 5).**

Where indictment for using mails to defraud alleged two means of carrying out scheme against different persons one found to be unintelligible might be disregarded, as immaterial or surplusage, without invalidating indictment, or violating rights under Fifth Amendment of the Constitution.

**5. Post office ⬅49—Evidence held to support conviction of use of mails in fraudulent scheme (Criminal Code, § 215 [Comp. St. § 10385]).**

Evidence *held* to support conviction of using mails in fraudulent scheme, in violation of Criminal Code, § 215 (Comp. St. § 10385).

**6. Post office ⬅35—Brokers held part of customer's scheme to defraud when participating in with knowledge thereof (Criminal Code, § 215 [Comp. St. § 10385]).**

Brokers who knew of fraud indulged in by firm they represented on exchange, and participated therein, *held* to have been part of the

*Certiorari denied 46 S. Ct. 475, 70 L. Ed. ——.

scheme to defraud under Criminal Code, § 215 (Comp St. § 10385).

**7. Post office ☞35—All who with criminal intent join themselves to principal schemer are liable (Criminal Code, § 215 [Comp. St. § 10385]).**

All who with criminal intent join themselves, even slightly, to principal schemer, are liable under Criminal Code, § 215 (Comp. St. § 10385), although they may know nothing but their own share in the aggregate wrongdoing.

**8. Post office ☞35—Floor broker, assisting copartnership in illicit trading, held participant in scheme to defraud (Criminal Code, § 215 [Comp. St. § 10385]).**

Floor broker, who assisted copartnership engaged in bucketing orders with knowledge of the illicit trading, *held* to have been participant in scheme to defraud customers, under (Criminal Code, 215 [Comp. St. § 10385]).

**9. Post office ☞35—President of Stock Exchange, advising parties whom he knew were insolvent and engaged in illegal business, to continue in business, held accessory to scheme to defraud (Criminal Code, §§ 215, 332 [Comp. St. §§ 10385, 10506]).**

President of Stock Exchange, who had advised copartnership engaged in running bucket shop to continue business when they were insolvent and indulging in illegal practices, *held* an accessory, under Criminal Code, § 332 (Comp. St. § 10506), to violation of section 215 (Comp. St. § 10385), and chargeable and triable as principal.

**10. Post office ☞35—Intent to use mails at time of entering into scheme need not be shown (Criminal Code, § 215 [Comp. St. § 10385]).**

In prosecution for violation of Criminal Code, § 215 (Comp. St. § 10385), it is not necessary to prove that defendants, at time they entered into common scheme, intended to use mails, but it is enough that mails were used in execution of scheme.

**11. Criminal law ☞680(1)—That evidence was introduced after ruling that paragraph was insufficient held immaterial, it being admissible under other paragraph.**

That evidence was received after ruling that paragraph in indictment was insufficient, rather than beforehand, *held* immaterial, as it tended to show offense charged in other paragraph.

**12. Criminal law ☞423(1).**

Acts and statements of party carrying into effect purpose on which he is engaged in common with others are admissible against his fellow collaborators.

**13. Criminal law ☞423(7)—Statements and acts of members of brokerage firm and clerk in furtherance of its scheme to defraud customers admissible against participants.**

Acts and statements of brokerage firm and its clerk, who were involved in furtherance of its scheme to defraud its customers, were admissible against all participants in scheme.

**14. Criminal law ☞434—Books containing secrets of scheme to defraud admissible against members of firm having knowledge of them.**

Books of brokerage firm, which held secret of firm's bucketing, kept with knowledge and under direction of members of firm, *held* admissible against them in criminal prosecution.

**15. Criminal law ☞824(8)—Proper course of defendant, complaining of admission of evidence as to him was to ask for instruction as to effect (Criminal Code, § 215 [Comp. St. § 10385]).**

Where defendants, in prosecution for violation of Criminal Code, §·215 (Comp. St. § 10385), complained of admission of books kept by certain of defendants as against them, their proper course was to ask for an instruction limiting their effect.

**16. Criminal law ☞824(8)—Failure to instruct jury as to limitation of evidence, in absence of request, is not reversible error.**

Failure to instruct jury as to limitation of evidence, as affecting certain of defendants, is not reversible error, in absence of request for such instruction.

**17. Criminal law ☞807(1).**

Requested instruction, which was argumentative and would have caused confusion in minds of jury, was properly refused.

**18. Criminal law ☞434.**

Records of committees on Stock Exchange, made at meetings at which defendants were represented, were admissible in evidence against them.

**19. Criminal law ☞695(3).**

General objection to evidence admissible against some of the defendants, was insufficient.

**20. Criminal law ☞351(10)—Evidence of efforts made to induce witness to leave is competent.**

Evidence of efforts made by defendants to induce codefendant to leave New York, so as not to be available as witness in Stock Exchange investigation, *held* competent evidence.

**21. Post office ☞49—In prosecution for using mails to defraud, proof on cross-examination that defendant had dealings with other firms engaged in like operations as his codefendants held competent to show knowledge.**

In prosecution for using mails in scheme to defraud, on cross-examination of defendant, who was president of Stock Exchange, it was competent to show that other firms with which he came in contact were bucketing orders in much the same manner as his codefendants, to show his knowledge.

**22. Witnesses ☞277(1)—Defendant, on witness stand, is subject to inquiry as any other witness.**

When a defendant takes the witness stand, he occupies a dual capacity, and, as witness, is subject to inquiry as would be any other witness.

**23. Criminal law ☞728(2).**

Failure of trial judge to take action on his own initiative, after admonition to district at-

torney during summation was not heeded, was not error.

**24. Criminal law ⊜847—Court is not obliged to go through all requests, and see if they have been covered, and errors and omissions should be pointed out.**

Court is entitled to have his attention called to some error in his colloquial charge, or some specific thing he has omitted therefrom, and is not obliged to go through all requests, and see if they have been covered in main charge.

**25. Criminal law ⊜858(3)—Jury may call for exhibits at any time, and consider them in their consultation.**

Exhibits may at any time be called for by jury, and taken into consideration in their consultation, and jury has right to examine them as to any particular.

**26. Criminal law ⊜858(2)—Permitting jury to examine books of account after retirement and at their request held proper (Criminal Code, § 215 [Comp. St. § 10385]).**

In prosecution for violation of Criminal Code, § 215 (Comp. St. § 10385), permitting jury, after retirement and at their request, to examine books of account of defendant brokerage firm, showing payment of commissions to floor broker, also a defendant, held proper.

In Error to the District Court of the United States for the Southern District of New York.

William S. Silkworth and others were convicted for violation of Criminal Code, § 215, and they appeal. Affirmed.

Nathan A. Smyth, of New York City, for plaintiff in error Silkworth.

Frederick J. Sullivan, of New York City (Philip C. Samuels and Max Lazarus, both of New York City, of counsel), for plaintiff in error Gilbough.

Jacob M. Mandelbaum, of New York City (James I. Cuff, of New York City, of counsel), for plaintiffs in error McQuade and Quillan.

William C. Fitts, of New York City (Albert Massey, and Michael S. Gleason, both of New York City, of counsel), for plaintiffs in error Nicholas and Truesdell.

Emory R. Buckner, U. S. Atty., of New York City (Robert E. Manley, David P. Siegel, and Ben Herzberg, Asst. U. S. Attys., all of New York City, of counsel), for the United States.

Before ROGERS, MANTON, and HAND, Circuit Judges.

MANTON, Circuit Judge. The indictment charges, in 14 counts, violations of section 215 of the United States Criminal Code (Comp. St. § 10385). The charging phrase of the first count is reiterated without repetition in each of the remaining counts of the indictment. Only the mailing matters set forth in each of the counts is different.

The charging phrase outlines devising or intending to devise a scheme or artifice to defraud. It may properly be classed in two charges of a scheme or artifice to defraud as follows:

(1) It was a further part of such scheme and artifice so devised and intended to be devised that the defendants Raynor, Nicholas & Truesdell would comply with the orders of certain of the customers for the purchase of stocks, bonds, and securities, and that the defendants Louis Gilbough, McQuade Bros. and Francis X. Quillan, who were engaged as brokers in buying and selling stocks, bonds, and securities in the open market, would actually purchase for the firm of Raynor, Nicholas & Truesdell, for the accounts of such customers, the stocks, bonds, and securities ordered by the latter, it being part of the scheme and artifice aforesaid that the defendants Louis Gilbough, McQuade Bros., and Francis X. Quillan would, with the consent and at the direction of other defendants, immediately following such purchases, sell the stocks, bonds, and securities so purchased, without the knowledge or consent of such customers, and that the defendants Raynor, Nicholas & Truesdell held and retained the stocks, bonds, and securities so purchased subject to the further orders of such customers, and conceal from such customers the fact that shares of stock so purchased had been resold, thereby inducing such customers to pay interest and other charges upon sums of money remaining unpaid by them upon the purchases aforesaid.

(2) It was a further part of the scheme and artifice, devised and intended to be devised as aforesaid, that the defendants Raynor, Nicholas & Truesdell falsely and fraudulently represent and pretend to certain other customers that the firm of Raynor, Nicholas & Truesdell had purchased stocks, bonds, and securities pursuant to such customers' orders, when in truth and in fact such purchases had not been made, and to enable the defendants Raynor, Nicholas & Truesdell to represent and pretend, with an appearance of color and truth, that such purchases had been made, the defendants planned and intended that the defendants Louis Gilbough, John H. McQuade, Edward A. McQuade, and Francis X. Quillan would falsely and fraudulently furnish to the defendants Raynor, Nicholas & Truesdell, who

would then falsely and fraudulently pretend to receive information and data to the effect that the orders of the customers were actually and in fact executed by the defendants Louis Gilbough, John H. McQuade, Edward A. McQuade, and Francis X. Quillan at the instance and direction of the defendants Raynor, Nicholas & Truesdell, who would then falsely and fraudulently make and cause to be made and deliver and cause to be delivered to the customers through the post office establishment of the United States memoranda and paper writings which purported to show, and in substance and effect did show, that such orders for the purchase of stocks, bonds, or securities had been executed, carried out, and more particularly that the defendants Raynor, Nicholas & Truesdell had purchased the required shares of stock, bonds, or securities from the defendants Louis Gilbough, John E. McQuade, Edward A. McQuade, and Francis X. Quillan in the open market, and were holding and retaining such shares of stock, bonds, or securities for the account of and subject to the further orders of such customers who, as the defendants planned and intended, would be induced to pay interest and other charges on sums of money remaining unpaid by such customers upon the purchase price of such stocks, bonds, and securities.

At the trial, motions were made to dismiss and quash the indictment, because it was claimed that the allegations with reference to the scheme to defraud were repugnant and unintelligible. After consideration, the trial judge sustained this view as to the charge set forth in the first paragraph above, but held that the remaining allegations set forth sufficiently a charge of devising or intending to devise a scheme or artifice to defraud. He stated that he would exclude testimony tending to support the charge as set forth in paragraph 1, and in charging the jury the court said, speaking of the charge of the indictment: "They allege in the indictment that these defendants entered into a scheme to defraud, and after omitting a portion of the indictment, which I said, because of its language, must be disregarded, they are charged as follows."

It is argued that these rulings of the court, both on the motion to dismiss the indictment and in the charge to the jury, changed the indictment and placed the plaintiffs in error on trial on a charge different from that set forth and as found by the grand jury, and that this violated their rights under the Fifth Amendment of the Constitution of the United States. The argument is that under Ex parte Bain, 121 U. S. 1, 7 S. Ct. 781, 30 L. Ed. 849, the rulings of the court breached article 5, which provides that no person shall be held to answer for a capital or otherwise infamous crime, unless upon presentment or indictment of a grand jury, and that, when an indictment is filed with the court, no change can be made in the body of the instrument by order of the court without a resubmission of the case to the grand jury, and the fact that the court may deem the change immaterial and strike it out as surplusage would not change the result, and this for the reason that the instrument as thus changed is no longer the indictment of the grand jury which presented it.

[1, 2] Assuming, as we must, in conformity with the ruling of the trial court, that paragraph 1, which charged the means of operating the scheme, was obscure, or, as put by the court, "unintelligible," did not vitiate the indictment as a whole, providing the language, disregarding the ambiguous portion, sufficiently set forth a general scheme which constituted an artifice to defraud. The indictment sets forth two modes of operation by which the firm of Raynor, Nicholas & Truesdell, with the assistance of the other plaintiffs in error planned and carried out their scheme of bucketing. As apparently attempted to be set forth in paragraph 1, they planned, first, to buy the stock the customers ordered and then to sell it without their consent; second, against customers, they intended not to buy the stock, but nevertheless to represent that they had. The indictment does sufficiently show the latter artifice to defraud as operated against certain customers. It was proper to include the two modes of operation in an indictment, and no duplicity can be charged against such an indictment. Byron v. United States, 259 F. 371, 170 C. C. A. 347. Various means used in committing the offense may be joined without duplicity. Gourdain v. United States, 154 F. 453, 83 C. C. A. 309.

[3, 4] The fallacy of the claim that the indictment is bad is due to the failure of the plaintiffs in error to observe that charges 1 and 2, as above given, are independent of each other. The introductory lines of each paragraph distinguished the application of that paragraph, one from the other. Sufficiency may not be tested by reversing the paragraphs as they appear in the indictment, as is attempted by some of the plaintiffs in error. No reference is made to the limitation of the first paragraph "to certain of the cus-

tomers" and of the second "to their customers." The language used relates to different groups of victims. Under section 215, more than one misrepresentation or more than one pretense may be charged, so long as they are part of the same scheme, and, indeed, they may be set forth in one count. A sufficient averment and proof of one will sustain the indictment. Proof of one of the several means or methods alleged in the indictment will warrant the conviction. Nash v. United States, 229 U. S. 379, 33 S. Ct. 780, 57 L. Ed. 1232; Chambers v. United States, 237 F. 513, 150 C. C. A. 395; Bergera v. United States (C. C. A.) 297 F. 112; Myers v. United States, 223 F. 925, 139 C. C. A. 399. An indictment for false pretenses is good, if any one of the pretenses set out is sufficiently alleged. Commonwealth v. Morrill, 62 Mass. (8 Cush.) 571; Commonwealth v. Parmenter, 121 Mass. 354; State of Iowa v. Nine, 105 Iowa, 131, 74 N. W. 945. Therefore one of the paragraphs—and certainly the one found to be unintelligible—may be regarded as immaterial or surplusage, and as such it could be disregarded, and the indictment is good without reference to it. Maresca v. United States (C. C. A.) 277 F. 727; Anderson v. United States (C. C. A.) 293 F. 1018.

The court had no alternative but to try the plaintiffs in error and to instruct the jury to disregard the allegation which was insufficiently set forth. The Queen v. Wickham, 10 Ad. & E. 34; People of the State of New York v. Blanchard, 90 N. Y. 314. In Ex parte Bain, supra, there was held to be an amendment to the indictment. At bar, nothing was struck from the indictment, nor was it rephrased. The court merely disregarded the unintelligible part of the indictment, which did no violence to what remained as a sufficient charge of an artifice or scheme to defraud, as within the doctrine of Ex parte Bain. To hold otherwise would be an undue extension of that doctrine, and would be at variance with the development of the cognate law since that decision. Hall v. United States, 168 U. S. 632, 18 S. Ct. 237, 42 L. Ed. 607; Goto v. Lane, 265 U. S. 393, 44 S. Ct. 525, 68 L. Ed. 1070; Friedman v. United States (C. C. A.) 276 F. 792; Anderson v. United States (C. C. A.) 294 F. 593. "The statute, not the drafter of the indictment, measures the law. * * * If he includes all the essential elements and more, * * * the pleader cannot enlarge the law, and the case will be sustained and the law vindicated by ignoring the unessential allegations."

Meyer v. United States, 258 F. 212, 169 C. C. A. 280.

In Goto v. Lane, supra, the Supreme Court pointed out that there was an actual amendment of the indictment in Ex parte Bain. De Luca v. United States (C. C. A.) 299 F. 741, and Dodge v. United States, 258 F. 300, 169 C. C. A. 316, 7 A. L. R. 1510, are distinguishable. In the latter case, a part of the indictment was stricken out, which changed the charge. In the former, there was a consolidation of indictments, which was held to be erroneous. It has never been held that an indictment is bad because one of several charges of misrepresentations or false pretenses is badly laid. What occurred in ruling on the motion to quash the indictment and the instruction to the jury did not constitute error.

Plaintiffs in error Truesdell and Nicholas were copartners with one Raynor (who became a witness for the government) as brokers. No doubt their scheme of carrying on their business involved false representations and constituted a scheme to defraud, within section 215 of the United States Criminal Code. They began business on August 1, 1920, and ended as bankrupts May, 1922, when they were short about $3,750,000. At first they purchased the stock ordered by their customers, and when they thought the market would drop, and they could advantageously take a position against their customers, they sold the customer's stock. Later under their scheme of operation, they did not purchase the stock in the first instance. Indeed, they took positions against their customers within a week after they entered business. They first traded in a small way, and, as the financial advantage of taking positions against their customers appeared to them, they did so on a larger scale, with the expected result. Early in the partnership relations, Raynor expressed regret that they had not taken a position against their customers, and stated that, if they had, "we would have made some money." Truesdell and Raynor both advised their stock record clerk that they could not possibly exist on commissions and interest alone. They thus gambled with the chance to make money against the interests of those who trusted them. On the whole, bucketing was the rule, rather than the exception, in their business. In the latter stage, it was almost their sole business.

On the New York Curb Exchange, the firm employed the plaintiffs in error McQuade and Quillan, and on the Consolidated Exchange they employed the plaintiff in er-

ror Gilbough. The method of operation in each was somewhat different. In the case of the Curb Exchange, the customer would order shares of stock from the firm. An order card went to the margin clerk, to certify that the customer had sufficient margin on hand. From him it went to one of the members of the firm, who was then in the "cage," where the orders were transmitted to the brokers on the Exchange. If marked "A," the clerk charged with transmitting the order over the telephone knew it was for the broker who represented them on the Curb Exchange. At the time he gave the order of purchase, he would also give an order for sale of the same amount of stock at the same price. He would telephone to the plaintiffs in error McQuade and Quillan, their brokers at the Curb Exchange, "to buy and sell —— shares at ——." When the particular share of stock hit the price or under, an answer would come from the curb broker, "You bought and sold —— at ——." Then a white card was prepared, showing the sale, charging it to the "stock loan account." The "stock loan account" was the name under which the copartnership carried the account in which they covered the sales then made to offset their customers' purchases. The purchase was noted on the "purchase" blotter, and the sale on the "sale" blotter. They showed that the plaintiff in error McQuade, as a broker, effected the purchase for the customer, and the plaintiff in error Quillan the sale for the stock loan account. In a column on the blotter there was marked the number of the certificate. An "ex check" stamp was put against the customer's name, corresponding to the "ex check" stamp against the stock loan entry. The "ex check" meant that the two transactions were offset, one against the other, and that accordingly there was an exchange of checks.

[5] In order to cover up the transactions, there was an actual exchange of checks. If it was a genuine purchase and a genuine sale, unrelated to each other, the copartnership would send the curb broker, McQuade, their check for the purchase price, and the plaintiff in error Quillan would have paid for the stock sold by the copartnership. The failure to show such payments would disclose the scheme. Therefore, to guard against this at the close of the day, the copartnership sent the plaintiff in error McQuade their check, and McQuade or Quillan sent the firm his check for the same amount, or the copartnership and McQuade would lump all the transactions and exchange checks covering all of them for the one day. The charges for the transfer stamps were included in the monthly statements of McQuade and Quillan to the copartnership. After this, the copartnership mailed a confirmation, showing the purchase, to the customer. They charged him a commission and the usual amount of interest, calculated at the market price of the stock. The customer already having put up the margin, as the stock fell in price, he was called upon for further margin by the copartnership; otherwise, they said, they would sell his stock. The record does not disclose what McQuade did after he received the order to buy and sell. The Curb Exchange had no clearing house at this time, and the curb broker and the copartnership carried on and covered up their transactions. There was no ticker or records kept by the Curb Exchange. The evidence amply supports each instance charged in the several counts of the indictment upon which the plaintiffs in error have been convicted of the fraudulent scheme and in the mailing of the respective letters as charged.

In the Consolidated Stock Exchange, the plaintiff in error Gilbough acted somewhat differently. There brokers, when they acted legitimately, purchased the stock for customers and held it for them on margin. Gilbough did not execute the orders himself. He was an intermediary between the customer, which was the copartnership, and the brokers, or specialists, as they are called, dealing on the floor of the Consolidated Exchange in the stocks they wanted. It was the plaintiff in error Gilbough who suggested the method of operation on the Consolidated Stock Exchange. He made the arrangements with the brokers or specialists on the floor, under which they would accept two orders from the copartnership covering the same check, one canceling the other, and gave the copartnership a confirmation of the order. The firm would then show his name as broker on the confirmation sent to their customer. The specialist's pay for his services was one-eighth or one-quarter of a point on each share. If the customer's order was to buy at a price, the specialist would not buy until the market dropped one-quarter of a point; then he would immediately sell the same at the same price. Through the copartnership, he would get his charge of a quarter of a point. If the order was to sell at a price, he would not sell until the market rose one-quarter of a point, and then buy at the same price. A purchase card was made to conform with the sale card, showing the sale to the

stock loan account. Putting it as Raynor testified: "We simply at that time covered up the * * * transaction. When he sold, we bought." A confirmation of the transaction was mailed to the customers by the copartnership.

Another method of bucketing which the copartnership employed was to offset the orders of their customers in their own office, without going through the operation of transmitting them through any exchange. They "paired off" one transaction with another. It saved the copartnership brokerage charges on the one hand, but they had to resort to various devices to furnish the names of brokers to their customers. Gilbough's name was frequently used, and this was with his consent. When the orders were marked "P. O." (paired off), no broker was used. Various names were used to indicate the accounts. The term "stock loan" concealed the purpose of the account, for it appears that in this line of brokerage business the stock loan account signifies a very different purpose. In their practice of trading, the copartnership abandoned the use of symbols. The order clerk traded against the orders, unless he was told to the contrary. This practice was indulged in when Truesdell worked side by side with him, as well as when Raynor did, and Nicholas also appears to have known of the symbols.

[6] We have no doubt that the record clearly establishes Truesdell's and Nicholas' knowledge of the scheme or artifice to defraud, and that they participated in it, and knew of the mailing of the letters and statements to customers for their information and in furtherance of their scheme. Plaintiffs in error McQuade and Quillan were in the same office. The copartnership paid for Quillan's seat on the Exchange in the first instance. The records of the stock transaction show McQuade named on the purchase, and invariably showed Quillan named on the corresponding sheet. Raynor testified to instances when he gave orders directly to McQuade, instead of, as usual, to his clerk. Sometimes Quillan appeared as the broker of the purchase, and McQuade as the broker of the sale. McQuade solicited the business from the copartnership, and later paid the record clerk a percentage on the business he directed to him, rather than to some other broker. At first McQuade received 5 per cent. of the business done in stocks traded on the curb market. At the time of the failure he was getting about 95 per cent. McQuade submitted charges on one side of each transaction

in accordance with the custom prevailing among brokers engaged in bucketing, and in violation of the rules of the Curb Exchange. The fiction was indulged in of it appearing that either he or Quillan were paid for buying and selling for the stock loan account. It there appeared that McQuade and Quillan received commissions at the rate charged by brokers engaged in legitimate transactions; that is, brokers who actually bought the stock for their customers and held it for them on margin. Checks in evidence show these alleged transactions and payment for commissions both to McQuade and Quillan. There can be little doubt that both knew of the bucketing indulged in, and participated in it as indicated. They assisted in the copartnership defrauding their customers. They were part of the scheme to defraud.

[7, 8] The plaintiff in error Gilbough was the copartnership's only floor broker on the Consolidated Exchange from September, 1921, until the failure in May, 1922. He was paid $2 for each 100 shares purchased, and appears to have earned $36,000 in less than eight months. The method of trading adopted was suggested by Gilbough; that is, by allowing the specialists to whom Gilbough transmitted the orders to receive from one-eighth to one-quarter of a point. Gilbough knew of the illicit trading. He seems to have been on the watch to tip off Raynor of the investigations, and conferred with Raynor as to these investigations, when they took an unfavorable turn. He knew of the insolvency of the copartnership from the first, and throughout the period of insolvency, from February 1, 1922, to the failure, he continued to execute their orders for bucketing. To satisfy a jury that he was a participant of the scheme to defraud customers was an easy task under the circumstances, and they found him guilty. If his intent was criminal, when he joined a dishonest enterprise, he was part of the scheme. One man may form and accomplish it, with or without assistance; but all who with criminal intent join themselves even slightly to the principal schemer are subject to the statute, although they may know nothing but their own share in the aggregate wrongdoing. One man may render the scheme unitary, though he has the assistance of many others at different times. Schwartzberg v. United States, 241 F. 348, 154 C. C. A. 228; Wilson v. United States, 190 F. 427, 111 C. C. A. 231.

The plaintiff in error Silkworth was president of the Consolidated Exchange. In that position, his assistance to the copartnership

in carrying out their scheme was of importance. The Consolidated Exchange required frequent reports of each member—clearing house sheets showing the daily purchases and sales and stock position reports. The ways and means committee existed to investigate complaints of irregular trading. This plaintiff in error was an ex officio member of this committee, and was called upon to exercise judgment over violations committed by members. The members of the copartnership, particularly Raynor, recognized the importance of the friendship and aid of this plaintiff in error, and set about to cultivate it and to gain his assistance. They were on intimate terms. In June, 1921, they paid him $1,000, and $500 more in September. Silkworth requested Raynor to see him in November, 1921, and warned him of impending investigation. He had clearing house sheets before him, and pointing to these he said that the trading done by the firm was showing up too plainly. He told Raynor that certain "old fogies" on the exchange were raising objection to the trading, but that he had the situation well under control, only he warned them that they must be more careful. He suggested that they "put down orders for broad lots, and not odd lots."

A "broad" lot is a block of 100 shares or more. A clearing house sheet is a daily record or tabulation of the broker's purchases and sales on the floor of the exchange. The record showed the activity of every broker with sufficient particularity to disclose if a broker purchased 1,000 shares and then sold the same amount and kind at a difference of one-eighth of a point. Trading on a small scale could not be detected; if done in any considerable volume, it could be detected very readily. The conversation between Silkworth and Raynor occurred a day or two before the first meeting of the ways and means committee. It was the duty of the ways and means committee to investigate charges against any member of the exchange, and if they found them well founded to refer them to the board of governors for final action. The minutes of the meeting for November 21, 1921, show charges of irregular trading by the copartnership. The matter was referred to the president, this plaintiff in error, for action as his discretion might dictate. The charge of irregular trading was crossing trades and nullifying clients' orders.

After the meeting, Gilbough told Raynor there had been difficulty, and he had better see Silkworth. Silkworth told him the trouble about his trading was that they were "doing it in too much a volume." First this plaintiff in error told Raynor that for the time being he would have to discontinue trading, but, when asked by Raynor if they should write the orders off in their office, this plaintiff in error said, "No;" he wanted them to put every order that they could through the Consolidated Exchange. On his advice, they limited trading for a few days, and then opened up again two or three days later, transmitting the orders through Gilbough. Several weeks later, at Christmas time, this plaintiff in error accepted $500 from the copartnership. After this the stock market declined, several brokerage houses failed, and banks and stock brokerage houses with which the copartnership had accounts, with hypothecated stock, demanded larger amounts for their protection. The copartnership sold customers' stock to meet the demand, and Raynor turned to Silkworth for advice as to whether they should continue the business, pressed as they were against the wall. Silkworth reassured them that the difficulty would probably soon be over, and said, "Don't let your business break your heart."

In February, 1922, the market took a turn upwards, and this proved disastrous to the firm, because they were short their customers' stock. Under their illicit practice, as the customers' position became worse, theirs became better, and, when the market began rising, the last of January and the first of February, the copartnership was short 65 per cent. of their customers' stock. As it rose to the time of failure, the position of the firm became worse. They sold more of their customers' stock, and took longer chances. In February, 1922, they were again charged before the ways and means committee of the Consolidated Exchange with illicit trading. The matter was referred to accountants for analysis as to what disposition the firm was making of stocks they were supposedly carrying for customers. The report was delayed from time to time, and when, in March, a partial report was filed, the matter was postponed, because Silkworth was not present. The committee requested the firm to have a representative appear, and thereupon Silkworth stated that "the matter would be adjusted all right;" he would see to that; that he had not lost control of the situation, and that Raynor was to appear, and everything would be all right. At the next appearance, in March, 1921, Silkworth was present, expressed surprise at the firm's reported insolvency, and denied it. A member of the com-

mittee asked Raynor if he was short 25 per cent. of his customers' stock and he said he was; that he was short, not only that amount, but 50 per cent., and "unless I can get some Stock Exchange connections I will be short more," at which Silkworth said, "Strike that from the record." There was a postponement of the investigation, with the hope that the market might fall and materially improve the bankrupts' position. They succeeded in obtaining extensions until April 23, 1922, when an audit showed a deficit in excess of $400,000. The copartnership contended inaccuracy in the record, and the matter was continued.

In the meantime the firm continued to trade until the second audit, as of March 31, 1922, showed a deficit of $739,181.88. The firm was expelled from the exchange by the board of governors on April 28, 1922, and the bankruptcy proceedings followed. Raynor said he kept Silkworth posted on their condition during the period of inquiry. At the time the accountants were engaged by the committee and made their report of its insolvency, he discussed the matter with Silkworth, and on many occasions he spoke to Silkworth of the accountants' attitude, and "what he was going to do, or what they were going to do over there; what I expect, or what I could not expect." From time to time the Consolidated Exchange received letters from prospective customers of the concern, inquiring about their responsibility. The secretary of the exchange answered that the firm was in good standing and the exchange considered them reliable. The record shows that this plaintiff in error directed the secretary to write such letters from November 21, 1921, to as late as March 13, 1922. Indeed, the copartnership continued to trade on this exchange until the date of failure.

[9] To advise them to continue business when they were insolvent and indulging in illegal practices, plaintiff in error placed himself in the position of an accessory within section 332 (Comp. St. § 10506). Much of the business was done after this advice. As an accessory, he was in the position of one to be charged and tried as a principal. Harris v. United States (C. C. A.) 273 F. 790. He took no action in the matter, but tried to cover up the brokers. Indeed, he planned to obstruct the expulsion of the firm from the Consolidated Exchange and to enable them to do business. It is clear from the record that he knew of the practice of the firm of bucketing, and that he made it possible for them to bucket by his conduct and the protection he endeavored to give them.

[10] It is not necessary to prove that any of the plaintiffs in error, including this one, at the time they entered into the common scheme, intended to use the mails. It is enough that the mails were used in its execution. United States v. Young, 232 U. S. 161, 34 S. Ct. 303, 58 L. Ed. 548. And this plaintiff in error must have known that the firm would have to use the mails, if for no other reason than through its various branch offices throughout the country communicating with its customers. His connection with the scheme to defraud, as disclosed by the testimony, required the trial judge to submit the question of his guilt or innocence to the jury.

[11] Error is assigned, based upon the claim that the trial judge received evidence in support of the paragraph of the indictment which he held to be insufficient. It is asserted that he reversed his ruling that he would not admit evidence of actual purchases, followed by the sales of the same stock. Reliance is placed upon the admission of evidence as to the stock loan account and other records of the firm. It is clear that the evidence which was admitted tended to show the offense charged in paragraph 2, referred to above, and the fact that the evidence was introduced after, rather than beforehand, is immaterial. Vandell v. United States (C. C. A.) 6 F.(2d) 188.

[12] At the opening of the trial it was announced by the court that the government's evidence would be admitted against all the defendants, subject to connection. The records of the copartnership were admitted in evidence. The court from time to time reiterated its position that it received them subject to connection. The purchase and sale cards admitted caused objection, but they were part of the record. They were cards showing various transactions which were made by the copartnership. They were introduced to establish an intention on the part of the firm to trade against the customers' accounts. There is ample evidence to show the use of the cards and the part they played in the transactions. The notations reflect the intention to trade, and were written statements of parties in consort with the plaintiffs in error—all of them—in furtherance of their conjoint action. They were in line of operation and indispensable to its execution. Acts and statements of one party, carrying into effect a purpose upon which he is engaged in common with others, are admissible against his fellow collaborators.

Hitchman Coal & Coke Co. v. Mitchell, 241 U. S. 644, 36 S. Ct. 450, 60 L. Ed. 1218; Hamburg-American Steam Packet Co. v. United States, 250 F. 747, 163 C. C. A. 79; Pennacchio v. United States (C. C. A.) 263 F. 66.

[13, 14] There is little doubt that the firm and its clerk, Romm, were obviously and directly involved in the furtherance of its scheme, and their acts and statements were admissible against all the participants. The books and monthly statement balances received in evidence were admissible against members of the firm and the clerks indicted. No motion was made to limit them. It appears that the records were under the immediate supervision of one of the defendants, Ovens, who was acquitted. The partners frequently gave instructions to the bookkeepers, and they were familiar with the records. This acquitted defendant had charge of the books which held the secrets of the firm's bucketing. Both Nicholas and Truesdell had access to the books, and Nicholas is shown to have frequently consulted them. The books thus kept with the knowledge and under the direction of the plaintiffs in error were admissible.

[15] In Foster v. United States, 178 F. 165, 101 C. C. A. 485, which involved bucketing under section 215, the court admitted books as "admissions or assertions of the facts stated therein" against the managers of the business, "upon proof of such connection and familiarity with the books as to justify an inference of actual acquaintance with their contents." Every one who has a right of access to them is charged with knowledge of their contents. Chadwick v. United States, 141 F. 225, 72 C. C. A. 343. The books were kept by employés and the agents of Nicholas and Truesdell in the course of their employment. The plaintiffs in error who now complain of the admission of these books at no time asked for instruction as to the nonbinding effect of the statements therein contained as to them. Adamson v. United States, 184 F. 714, 107 C. C. A. 633; Breese v. United States, 203 F. 824, 122 C. C. A. 142. The proper course was for such an instruction.

[16, 17] A motion by Silkworth to strike out some of the testimony, did not extend to the books under consideration. Failure to instruct the jury as to the limitation of this evidence, in the absence of request for such instruction, is not a reversible error. Schonfeld v. United States (C. C. A.) 277 F. 934. The plaintiffs in error McQuade and Quillan moved for the limitation of this testimony. Of the 122 requests made, counsel did not point out to the trial judge the instructions they relied upon, excepting the refusal to instruct. They contented themselves with excepting to the refusals to give requested instructions, "except as charged as to each of the defendants." The request made by these plaintiffs in error, McQuade and Quillan, was argumentative, and would have caused confusion in the minds of the jury, and we find no prejudicial error in this refusal. A request in part erroneous may properly be denied. Elliott et al. v. Peirsol et al., 1 Pet. 328, 7 L. Ed. 164; Chicago Great Western Ry. Co. v. McDonough, 161 F. 657, 88 C. C. A. 517.

[18-20] Error is assigned in the admission of the minutes of the ways and means committee and of the board of governors. The copartnership was represented at these minutes, and at some of them Silkworth was present. They were binding as against the plaintiffs in error Nicholas and Truesdell. No request was made to limit their binding effect in so far as the plaintiffs in error Gilbough, McQuade, and Quillan were concerned. A general objection to their admission was insufficient. Noonan v. Caledonia Mining Co., 121 U. S. 393, 7 S. Ct. 911, 30 L. Ed. 1061; Ball v. Sheldon, 218 F. 800, 134 C. C. A. 488. These records, as well as the evidence of the efforts made by the plaintiffs in error Nicholas and Truesdell to induce Raynor to leave New York, so as not to be available as a witness, were competent. Matters thus so interwoven, representing transactions while investigation was on, are all part of the general story of occurrences. Hodgskin v. United States (C. C. A.) 279 F. 85.

[21, 22] Error is assigned to the method of and to the substance of the cross-examination of the prosecuting attorney and to his remarks in summation. When the plaintiff in error Silkworth was cross-examined, he was asked questions relating to other failures, and the method of operation of other members of the Consolidated Stock Exchange, and whether they were short their customers' stock in the same way as the copartnership. As the witness Silkworth claimed ignorance of the bucketing operations of the copartnership, proof of knowledge of this was dependent peculiarly upon circumstantial evidence. Proof that other firms which Silkworth came in contact with were engaged in like operations would throw some light upon his comprehension of the operations of the copartnership. By circumstantial evidence, knowl-

edge of a defendant may be shown. Mitchell v. United States, 229 F. 357, 143 C. C. A. 477; De Four v. United States, 260 F. 596, 171 C. C. A. 360; Price v. United States, 53 App. D. C. 164, 289 F. 562; United States v. Durland (D. C.) 65 F. 408. The scope of cross-examination rests in the discretion of the trial judge. When a defendant takes the witness stand, he occupies a dual capacity— first, the witness; and, second, a defendant. As a witness he is subject to inquiry, as would be any other witness. Hart v. Atlas Knitting Co., 77 F. 399, 23 C. C. A. 198; Rumely v. United States (C. C. A.) 293 F. 532.

[23] In his summation, the United States assistant district attorney went beyond proper limits. At times he was cautioned by the court. It is argued that the bounds of proper summation were exceeded. The selection of isolated sentences of oratory furnishes a dangerous ground for judicial action. Hodgskin v. United States (C. C. A.) 279 F. 85. After admonition by the trial court, no further requests were made in the several instances, and it is urged that, because of the failure to take some further action by the trial judge on his own initiative, error was committed. Such is not the rule. Diggs v. United States, 220 F. 545, 136 C. C. A. 147; Richards v. United States, 175 F. 911, 99 C. C. A. 401; B. H. R. Co. v. Ploxin (C. C. A.) 294 F. 68.

[24] There were many requested instructions to the jury, which were not charged. Out of 122 such requested instructions, but 7 refusals to instruct are said to constitute error. The charge intelligently and correctly presented the facts and the law applicable to this criminal charge, under section 215 of the Criminal Code. The exception taken was not sufficiently specified to save any particular question counsel may have had in mind. When the court delivers a charge, he is entitled to have his attention specifically called to some error in his colloquial charge, or some specific thing he has omitted therefrom. He is not obliged to go through all the requests, and see if they have been covered in the main charge. Hamburg-American Steam Packet Co. v. United States, 250 F. 747, 163 C. C. A. 79.

[25, 26] The jury, after retiring, requested the books showing payment of commissions to Gilbough. They were contained in the books of account of the copartnership. Complaint is made of the act of letting the jury examine these books. Exhibits may at any time be called for by the jury and taken into

10 F.(2d)—46

consideration in their consultation. Rumely v. United States (C. C. A.) 293 F. 532. And the jury had the right to examine them as to any particular. Lefkowitz v. United States (C. C. A.) 273 F. 664. Objection was made to sending the books to the jury. The exception is unavailing.

We have examined the other errors assigned, as alleged to have been committed during the course of a long trial, before an experienced trial judge, who presented the case to the jury in an impartial charge, free from error, and we are satisfied that he cautiously guarded the rights of the plaintiffs in error throughout.

Judgment as to each of the plaintiffs in error is affirmed.